(57 South. 309.)

No. 18,253.

TEMPLEMAN BROS. LUMBER CO., Incorporated, v. FAIRBANKS, MORSE & CO.

(April 24, 1911. On Rehearing, Jan. 29, 1912.)

*(Syllabus by the Court.)*

1. SALES (§§ 178, 179*)—ACCEPTANCE OF MACHINERY SOLD.

Where machinery was received and used by the buyer for more than a year before offering to return it to the seller, during which time the buyer paid several installments of the purchase price without serious complaint as to the defects of the machinery, *held*, that the conduct of the buyer was equivalent to an acceptance of the machinery, but that such acceptance did not conclude the buyer from demanding a reduction of the price for nonapparent defects known to, but not disclosed by, the seller.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 451–468; Dec. Dig. §§ 178, 179.*]

2. SALES (§ 126*) — REDHIBITORY ACTION — PRESCRIPTION.

The prescription of one year against redhibitory actions and actions quanti minoris does not apply in cases where the seller had knowledge of the vices of the thing, and neglected to declare them to the purchaser.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 126.]

3. SALES (§ 130*)—REDHIBITORY ACTION—REDUCTION OF PRICE.

In a redhibitory suit, the judge may decree merely a reduction of the price.

[Ed. Note.—For other cases, see Sales, Dec. Dig. § 130.*]

*(Additional Syllabus by Editorial Staff.)*

4. WORDS AND PHRASES—"BACK-FIRING."

"Back-firing," as applied to an engine, is an explosion of gas in either the exhaust or intake pipe.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by the Templeman Bros. Lumber Company, Incorporated, against Fairbanks, Morse & Co. Judgment for defendant, and plaintiff appeals. Reversed, and judgment ordered.

Hubert M. Ansley and Eugene D. Saunders, for appellant. Ashcraft & Ashcraft and Hall, Monroe & Lemann, for appellee.

PROVOSTY, J. This is a suit in rescission of contract and in damages.

The plaintiff, Templeman Bros. Lumber Company of New Orleans, entered into a contract with the defendant, Fairbanks, Morse & Co. (Incorporated), of Chicago, Ill., on October 4, 1906, for the sale of a gas engine and its erection at the plant of the plaintiff in New Orleans, at an agreed price of $3,110, payable $1,000 cash, $500 upon shipment, and $1,600 in three equal payments at 6, 9, and 12 months from date of contract, for which the plaintiff company gave its notes.

The contract provided that the engine should produce 45 horse power on a consumption of 1¼ pounds of good clean Pennsylvania pea or nut anthracite coal, per brake horse power, and that it should be tested at

the works of the defendant company, and that no further test should be required. The engine itself, apart from the gas producer, was tested at the works of defendant, and found to operate perfectly. The gas producer was not used in making this test, and was not itself tested, for the reason that its construction is in part of brick and mortar, and hence it could be tested, or the engine could be tested in conjunction with it, only after it had been constructed at the place where the engine was to be permanently set up.

The engine was installed in plaintiff's plant in April, 1907. Plaintiff used it for the operation of its plant up to the time of the institution of this suit, August 31, 1908.

Plaintiff alleges that the engine has failed to fulfill the guaranty of producing 45 horse power; and that, "when operating at full load" (by which is meant, we assume, when producing 45 horse power), it consumes no less than 2½ pounds of coal.

Defendant's answer is to the effect: That the engine was tested at defendant's works and found to fulfill completely the guaranty of the contract. That it was properly installed at plaintiff's plant, but that the mechanic sent by defendant to install it could make no test of it, because, in the first place, before the engine could be set up, plaintiff allowed all the brass parts that possibly could be separated from it to be stolen, and, in the second place, furnished unsuitable coal, at first a semianthracite coal, full of clinkers and tar, which coated the gas producer with clinkers and the valves of the engine with tar, thus making proper results impossible, and later red ash coal covered with dust. That, nevertheless, plaintiff declared itself satisfied with the machinery, and accepted it unconditionally, and went on using it, making no complaint with regard to it. That, when the first of the notes given for the purchase price fell due on November 1, 1907, plaintiff paid it without demur or mention of any defect in the machinery. That a few days before the maturity of the second note plaintiff applied for an extension of time, still making no mention of any defect in the machinery, save as to a crack in the casting of the gas producer, which complaint defendant met by furnishing a new casting without cost to plaintiff. That on May 9, 1908, the third note having become due, together with a balance on the second note, on which defendant had granted an extension, plaintiff for the first time complained of the operation of the engine being unsatisfactory, and that plaintiff and defendant then entered into an agreement that defendant would send an expert to examine the engine, and that, if the trouble complained of was found to be due to defects in the machinery, defendant would pay the expenses of this expert, and that plaintiff would pay them if the trouble was found to be due to faulty operation, and that, although the engine had been greatly injured and its efficiency reduced by the unskillful manner in which plaintiff had been operating it, this expert secured from it the full efficiency guaranteed by the contract and on even a smaller consumption of fuel than that guaranteed in the contract; but that plaintiff refused to pay the expenses of the expert. Finally, defendant pleads the prescription of one year.

Defendant prays that the suit be dismissed, and that the plaintiff be condemned to pay the expenses of the expert, amounting to $500. Defendant also prays judgment for the balance due on the notes given for the purchase price.

Taking up the story of the case from the time the engine was installed and ready for operation, we find that Mr. Briggs, the engineer sent by defendant to install the engine, objected to the quality of the coal furnished by plaintiff. He said the coal

was too large, and had slate in it. Plaintiff acquiesced in the decision; and one of the members of the firm, Mr. R. N. Templeman, and Mr. Briggs, visited together the several coalyards in the city to inspect the coal there to be had. Mr. Briggs did not find any of the coal to be the pea or nut size; and he says it was not pure, but semianthracite. On both of these points he is contradicted by the dealers who sold the coal; and he himself destroys the value of his testimony on this point by frankly admitting that he knows nothing about coal. He, however, for want of better, he says, concluded to make a trial with the coal such as it was, and on April 26, 1907, proceeded to do so. Nearly the entire day was taken in the effort to get the engine started; and, when it did start, it could pull but very little. Another trial was made on the 27th, with no more satisfactory result. After this second unsatisfactory trial had been going on half a day, Mr. Templeman went to see Mr. Eghert, the New Orleans agent of the defendant, through whom the defendant had sold the machinery, and told him of the situation at the plant, and asked him what kind of coal he should get. Mr. Eghert showed him a letter from the Philadelphia & Reading Iron & Coal Company, offering two kinds of pea size anthracite coal, one red ash, and one white ash. Mr. Templeman asked him which was the best to order. Mr. Eghert answered that he really did not know, but that the red ash was supposed to be the better. Mr. Templeman said that as the difference in price was only 50 cents per ton, and he wanted the best results out of the engine, he would order the red ash; and he, accordingly, ordered at once a car load of the red ash. He then went back to the plant, and informed Mr. Briggs of what he had done. At the suggestion of Mr. Briggs, Mr. Templeman employed men to break some of the locally procured coal with hammers to what Mr. Briggs said was pea or nut size, and another trial was made. The machine operated no better. Mr. Briggs complained that the coal was still too large. Mr. Templeman then constructed a crusher; and another trial was made with the coal thus crushed, to no better satisfaction. Mr. Briggs said the coal was still too large; but that, if the coal could be made small, they would get along all right. The crusher was readjusted so as to produce a finer coal, which Mr. Briggs said was "just what was wanted," only that in the crushing a good deal of coal dust was produced which should be removed. Mr. Templeman procured a screen and screened the coal. With this new coal the engine operated much better; but still unsatisfactorily. Although only two of the four machines which it was designed to operate had been "put on," the load seemed to be too great. Every few minutes the "feed" would have to be thrown off, in order to let the engine regain its speed; and one hour to half a day would be lost in obtaining sufficient gas to set the engine running, and the fire would get too high in the producer; so that the producer would have to be emptied and refilled and the fire started anew; and in doing this an hour or two would be lost. Mr. Briggs explained the situation by saying that there was too much dust on the coal. He remained in New Orleans some six weeks, operating the engine. At this time the following letters passed between the parties:

"May 14, 1907.
"Templeman Bros. Lumber Co., New Orleans, La.

"Gentlemen: Some days ago we wrote you asking when you could get along without Mr. Briggs on your producer plant, as we expected to receive word from a concern in Louisiana to whom we shipped some weeks ago 100 H. P. plant that same had arrived and to send an erector to take charge of the work of placing and erecting the outfit. We have no word from you stating the condition of affairs regarding your plant, or when Mr. Briggs can leave the job. Will you please advise us promptly by return mail when Mr. Briggs can leave the job.

He has been on your work since the first of April, which is considerably longer time than is generally required to erect and get a producer plant under way, and we wish to use him on the other plant if it is possible to do so.

"Yours very truly,

"Fairbanks, Morse & Co."

"New Orleans, May 17, '07.

"Messrs. Fairbanks, Morse & Co., Chicago, Ill.

"Gentlemen: We have yours of the 14th regarding the necessity of Mr. Briggs remaining with us longer. We leave that matter entirely to him. When he feels that our man is sufficiently instructed to capably take charge of the plant, we presume he will say so and make arrangements to go elsewhere. As for our part, we are certainly not going to hurry him off, as we feel that the longer he remains the more thoroughly we will be instructed.

"Yours truly,

"[Signed] Templeman Bros. Lum. Co., Inc."

Mr. Briggs went to Plaquemine on June 2, 1907, to attend to some work for the defendant. The car load of red ash coal ordered on April 27th from the Philadelphia & Reading Iron & Coal Company arrived on June 3, 1908. The results obtained with it were about the same as with the other coal. Plaintiff wrote to the Philadelphia & Reading Iron & Coal Company, to find out if the coal was of the kind that had been ordered; and in the meantime went on operating the engine with it. After about three weeks of trial plaintiff summoned Mr. Briggs from Plaquemine. Mr. Briggs came, and operated the engine for one day. According to Mr. R. N. Templeman, he said that the red ash coal was not fit for a producer of that size. He himself makes two statements on the subject. One that "after the new coal arrived everything was running in first-class condition and Mr. Templeman made no more complaints"; another, that the coal was "dust covered and unfit." Mr. Templeman says that, upon being told that the red ash coal did not suit, he lost patience.

"I asked him why he didn't tell me that when I was ordering the coal. I told him we weren't millionaires, and didn't have any money to experiment with the plant; that we had purchased this plant to do work on anthracite coal; and that the contract didn't say whether it was to be white ash or red ash in it."

Mr. Templeman says that Mr. Briggs recommended the buying of white ash coal. Plaintiff went on using the red ash coal. Mr. Templeman testifies that he did so—

"because Mr. Briggs told me that I could operate with that coal, but, of course, there would be waste, and, of course, I would not get the results I would out of the white ash. He also told me that I could operate with it because it wouldn't hurt the plant; said if I could stand to keep the fire in condition—that is, from clinkering up and stopping the gas from going to the engine—I could use that coal. Of course, I would have some waste."

On August 24, 1907, plaintiff ordered a car load of white ash coal. It arrived on September 9, 1907, a few days after the supply of red ash coal had given out. During these few days plaintiff had used coal procured locally. Mr. Templeman testifies that this white ash coal clinkered a good deal less than the red ash; but that the working of the engine was about the same. Describing the situation, he says:

"Well, the same condition occurred all the time. We would start the fire, say, like Monday morning, everything fresh starting out. On Tuesday it would take an hour or an hour and a half or three hours, sometimes a half a day to start the plant. The same Wednesday; same way Thursday; same way Friday. Sometimes we didn't get started at all Saturday. We very seldom got a day's run at all, about two hours on Saturday, and we would have to pull the fire and get ready for Monday morning again."

This car of white ash coal lasted until December 10, 1907. In the interval from the departure of Mr. Briggs, in the latter part of June, 1907, to the middle of December, 1907, we do not find that any complaint was made by plaintiff as to the manner the engine was operating. Another car load of white ash coal had been ordered on the 21st of November, but did not arrive until the 11th of February. In the interval between the 10th of December and the 11th of February, coal was procured from the local dealers. Mr. R. N. Templeman testifies that the reason of their going on using the engine and trying to get along with it was

that Mr. Briggs had assured them that the sole and whole trouble was with the coal; but that towards the middle of December, 1907, he concluded that something must be the matter with the engine, and went to see Mr. Egbert, the local agent of the defendant company, and told him that something must be the matter with the engine; that he thought the producer was too small; that he had never been able to keep the fire down at the line where Mr. Briggs had instructed him to keep it. Mr. Templeman further testifies that on January 1, 1908, he lodged a formal complaint with Mr. Egbert, defendant's local agent, and that Mr. Egbert told him "he could not live without kicking," and that "he was talking through his hat."

At that time the following letters passed between the parties: January 6th letter of defendant demanding payment of note of $533.33, part of purchase price of engine; January 8th, reply letter of plaintiff asking for an extension of time; January 10th, reply letter of defendant refusing extension; January 13th, reply letter of plaintiffs frankly declaring their inability to pay; January 15th, reply letter of defendant insisting upon payment; January 17th, reply letter of plaintiffs repeating inability to pay; January 22d, reply letter of defendant threatening suit; January 25th, reply letter of plaintiffs as follows:

"January 25, 1908.
"Fairbanks, Morse & Company, Chicago, Ill.
"Gentlemen: Replying to yours of the 22nd, will state that if you bring suit you will certainly get your money. Our plant cost us $10,000, all of which has been paid except $2,067, and we have other assets amounting to $15,000 or $20,000. So far we have only had to ask an extension on two pieces of paper; one is yours and the other that of the American Wood Working Machinery Co., whose account is smaller than yours. We are compelled to ask this extension not because we have not the equivalent, but because we are unable to realize at this time. Sales have not only been very bad, but prices are likewise, and collections are the worst that it has been our lot to experience. We assure you we are not disposed to make you wait, and had you

delivered our plant in accordance with agreement, you would have had your money before the stringency struck us. As it is, we are absolutely unable to realize at this time and we trust that your good judgment will prevent you from doing as you say you will, bringing suit. Should you sue we know that you will get your money. However, you will not get it any quicker than if you waited and gave us a chance. We feel sorry that we have bought from people who are determined to do all in their power to ruin us.
"Hoping that you will think better of this matter and will look at it from a business rather than a spiteful standpoint, we are,
"Yours truly,
"Templeman Bros. Lumber Co., Inc."

The suggestion, "had you delivered your plant in accordance with agreement," refers to the delay in shipment, and not to the plant not having been such as was contracted to be delivered.

In none of these letters did the plaintiff make the slightest complaint about the engine not working satisfactorily or of defendant not having fulfilled its contract:

In April plaintiff called in an expert machinist. This machinist, while familiar with gas engines, had never had any experience with one like plaintiff's, provided with a gas producer attachment. He says that he stayed there a little while, and "the machine slakened down again," and that, when it did so, Mr. Templeman, addressing him, said:

"Now, where is the trouble? I says: 'It is not the igniter. Turn on your gas, and see how much gas you have in your plant.' And the consequence was there was no gas burning, the stream was not as great as when we started."

This machinist testifies that he was called to the plant four or five times; that there would be no trouble in starting the engine when the producer furnished sufficient gas, but that, after the engine would have run a while, there would be no more gas, and the engine could not be started again; that he noticed one morning that the coal was heated to the very top of the producer; that Mr. Templeman had it all taken out and a new charge put in. He testifies, further, that

there being no difference between such an engine and the ordinary gas or gasoline engine, except that this engine is provided with a producer to make its own gas whereas the ordinary gas engine is not, he persuaded Mr. Templeman to let him disconnect the engine from the gas producer and connect it with a gasoline tank; and that, after this had been done, the engine ran perfectly and pulled the load perfectly.

On April 28, 1908, plaintiff wrote to defendant the following letter:

"New Orleans, April 28, 08.
"Messrs. Fairbanks, Morse & Co., Chicago, Ill.

"Gentlemen: We have been having considerable trouble with our plant owing to the fact that we have been unable to get a uniform grade of coal. Since we started our plant last summer we have had only one car of coal that was satisfactory, and now we are running on gasoline, and it is costing us somewhere about 9.00 per day for the gasoline, which you will readily see is entirely too much.

"We learn from your former representative Mr. Eghert, that you can arrange these plants so as to run them with Texas oil, also by Texas Lignite. We will be pleased to have you write us fully all information bearing on the use of these two materials, as we must do something or else take the plant out.

"Hoping to hear from you by return mail, we are,
"Yours truly,
"[Signed] Templeman Bros. Lum. Co., Inc."

Mr. Templeman testifies that on May 9, 1908, he lodged a formal complaint with Mr. Beall, who had succeeded Mr. Eghert as defendant's local agent, and that Mr. Beall answered that he knew nothing about gas engines, and that plaintiff would have to take the matter up directly with the home office of defendant. Acting on that suggestion, plaintiff wrote to the defendant company at their home office in Chicago, complaining of the trouble they were having with the engine. This was the first complaint the plaintiff had made to the home office; and, so far as the record shows, the first intimation the home office had had of the engine not working to the satisfaction of plaintiff. It was then that the agreement referred to

in the answer was made, for the sending of an expert to examine the engine, and find out what was the trouble with it. Several letters passed between the parties at this time. We reproduce here one of them:

"May 12/08.
"Messrs. Fairbanks, Morse & Co., Chicago, Ill.

"Gentlemen: We are absolutely unable to do anything with our plant which we bought from you. We have been trying for a year to make this plant go, and have used every effort that was in our power. We bought the coal from the people recommended by your agent, the Pa. Reading Coal & Iron Co., through Mr. J. H. M. Claggert of Chicago, and in all of the time that we have been operating, we have only been able to get one lot of coal on which we could run the plant satisfactorily.

"We are now compelled to ask you to take this matter up at once and see if you can help us out, as we are very candid to state that we are extremely anxious to have this plant do the work properly, as we believe that should this plant be successful there will be other plants of the same nature put in this market.

"We have been cautious to keep from the outside world the defects as they appear to us, with the hope that time would prove that we had not made a mistake in putting this plant in, but as matters go from bad to worse instead of improving, we are now compelled to ask your co-operation in doing what is necessary to make this plant do the work according to your contract and agreement.

"Hoping to hear from you by wire on receipt of this, we are,
"Yours truly,
"Templeman Bros. Lum. Co., Inc."

Defendant's expert, Mr. Trowbridge, reached plaintiff's plant on June 6, 1908. He found that the engine had not been set up properly. In a letter of June 28, 1908, to the defendant, he says:

"The gas tank stands so close to exhaust muffler the gas (after engine runs a while) is heated to such an extent as to impair its value. The free air is also taken from immediately over the exhaust pot thereby becoming heated to an injurious extent, both of which trouble will in my opinion, have to be remedied to obtain satisfactory operation."

Mr. Trowbridge found, also, that the engine had been seriously injured in its operation by plaintiff. He says:

"On taking engine down to repair same, I found that cylinder is very badly scored on one side caused by the piston pin having become loose some time and working out. I think I

have mentioned the fact that the piston blows some, also find piston is cracked through each hole for piston pin."

[4] Mr. Trowbridge remained at plaintiff's plant 42 days; and got no better results from the engine than Mr. Briggs had done. He made two special tests, one on July 4th, and the other on July 16th. At the first of these plaintiff secured the presence of an expert in such engines, Wm. B. Gregory, professor of experimental engineering at Tulane University. Prof. Gregory testifies that Mr. Trowbridge began at 9 a. m., and that it was 1:50 p. m. before he succeeded in starting the engine. It then ran for about 15 minutes and stopped. It could not be started again until 3 p. m. It then ran for about 20 minutes, when it back-fired and stopped. By "back-firing" is meant an explosion of gas in either the exhaust or intake pipe. It was started again at 3:25, and ran for five minutes, and stopped again, and no further effort was made to start it that day. Mr. Trowbridge was trying to make the engine run continuously with a load of 45 horse power, and he failed in that attempt. Prof. Gregory made a test of his own on August 6, 1908. The engine was started at 10:30; stopped the moment load was put on; started again at 10:50 and load put on at 11; slowed down at 11:17, and load taken off; load put on again at 11:20; ran to 3:15, and stopped; started again 3:26, and load put on at 3:28; ran to 5:30. It then gradually lost power until the end of the work day at 6:45. The conclusion reached by Prof. Gregory was that:

"The plant as now constructed and arranged is not capable of giving 45 brake horse power for a continuous run of more than a few hours."

We find no evidence as to the test made on July 16, 1908, by Mr. Trowbridge except the following from Mr. Luther Templeman, a nonexpert, who witnessed the test, and kept an account of the number of revolutions and of the quantity of coal:

"On July 16th Mr. Trowbridge attempted to start the engine at 2:31 o'clock after attempting to start the engine during the morning hours. They finally got the load on at 2:44 o'clock p. m., and at 2:44½ o'clock the engine could not carry the load. The load was on again at 2:47, off at 2:47½, on at 2:51 p. m., off at 2:52 p. m., and so on continuously until 9:32 p. m., when the engine shut down."

From letters which passed between Mr. Trowbridge and the defendant company, we make the following extracts: Letter of June 8th, Trowbridge to defendant:

"We are rather up against it on the Templeman Bros. Lumber Co., 45 H. P. gas producer proposition. I find that it will be probably necessary to reline producer when replacing old base with new."

(N. B.—The base furnished with the machine had developed a crack, and defendant had consented to replace it with a new one without cost. to plaintiff.)

Defendant to Trowbridge, June 12, 1908:

"We have wired you to-day as follows: 'Replace base. Reline producer. Make test. Say nothing.' Please be careful to get everything first-class shape and we will fight it out with Templeman Bros. afterwards."

Trowbridge to defendant, June 28, 1908:

"The gas tank stands so close to exhaust muffler gas (after engine runs a while) is heated to such an extent as to impair its value. The free air is also taken from immediately over exhaust pot thereby becoming heated to an injurious extent, both of which troubles will, in my opinion, have to be remedied to obtain satisfactory operation."

Defendant to Trowbridge, June 29, 1908:

"It is absolutely necessary that a test be made on this plant, as Templeman is holding off paying the account because he says the engine will not develop 45 H. P., and that it will not operate on a pound and a quarter coal her H. P. per hour, and as long as there is no test made we can never collect."

Trowbridge to defendant, July 2, 1908:

"We are not getting very good results from Templeman Bros. producer as yet, the coal consumption running too high. I wrote you some time ago on the advisability of making some changes in the setting of gas tank, it be-

ing placed in such a position as to be heated to an injurious extent by exhaust. Thinking you may have overlooked same, I have drawn your attention to the fact. We have also had some trouble with water leaks. On taking engine down to repair same, I found that cylinder is very badly scored on one side caused by the piston pin having become loose some time and working out. I think I have mentioned the fact that the piston blows some, also find piston is cracked through each hole for piston pin."

Trowbridge to defendant, July 4, 1908:

"We have to-day made a brake test of Templeman's engine. The engine pulls up to guarantee (45 H. P.) easily which is very good considering the condition of the engine. I was unable to make fuel consumption test owing to lack of water as now operated. Templeman Bros. have all along insisted the engine would not develop rated power, but to-day they admitted they were mistaken and that engine was O. K. as to rating. They have calmed down now, and I think they will not demand a fuel consumption test which I think would be well, as it is my candid opinion that a fuel consumption test under the existing conditions would not show up as F. M. Co. would like it to. The piston blows badly, being cut, and cylinder is badly scored on one side by piston pin. I have kept in close touch with your Mr. Beall here and he is also of opinion that it would be well to settle if possible and drop the fuel proposition."

The statement made by Mr. Trowbridge in this report compares strangely with that of Prof. Gregory given above. Either he or Prof. Gregory has perverted the facts. We find no reason for not accepting the statement of Prof. Gregory.

The trial court would not allow the plaintiff to offer testimony to cover the 42 days during which Mr. Trowbridge was at the plant of plaintiff endeavoring to rectify whatever was the matter with the engine. This was on the theory that the only question before the court was "the condition of the plant on April 22, 1907." If this was so, we cannot imagine why all the evidence in the record, nearly all of which relates to a time subsequent to that date, was allowed to be offered.

Mr. Trowbridge was not examined as a witness to substantiate the statements of his letters to the effect that the plant op-

erated satisfactorily. He is contradicted in that respect by Prof. Gregory and by Mr. Luther Templeman; and the objection of defendant to letting in testimony on that point is very significant.

The two local agents of defendant were examined as witnesses in the case. Mr. Eghert was called by plaintiff, and Mr. Beall by defendant. They were no longer in the employ of defendant, and, as both seem to have been harboring a grievance against defendant, they cannot be suspected of partiality to defendant. Beall testified that he visited the plant in January, 1908, with a gentleman who was contemplating the purchase of a similar engine, and that he asked Mr. Templeman what success he was having with the engine, and that Mr. Templeman told him he "was getting good results"; that up to the time the first note fell due he had heard no complaint touching any excessive fuel consumption; that there had been some complaint "as regards the igniter, and the engine failing to pull the load and getting it to run satisfactorily"; that the first complaint he heard touching excessive consumption of coal was in July, 1908. On cross-examination he said:

"I have a recollection of a great many complaints being made to me by Mr. Templeman about the operation of the plant. These complaints were due to some irregularity or some fault or unsatisfactory working of the igniter of the engine that had no reference to the fuel consumption or the horse-power development."

He further testified that:

"Mr. Trowbridge made the statement that the engine would never run for any great length of time with that producer and fulfill the requirements of the contract."

Mr. Eghert testifies that a very short time after the installation of the engine Mr. Templeman complained that "he couldn't get the coal to burn up properly. It wouldn't consume the coal." And to the question, "Were there any other complaints made?" he answered: "Well, he complained about not be-

ing able to run the engine continuously, that it would run a little while, and the engine would slow down or refuse to pull the load."

He does not say at what time these other complaints were made. He testifies that Mr. Briggs, the mechanic whom defendant sent to set up the engine, told him that:

"Templeman would have, to use Briggs exact language, 'a hell of a time with running that engine'; that nobody could sell him that size engine and put that size producer to it. If they sold him an engine of that size, they would have to give him a larger producer."

That the engine never operated properly we think the record leaves no doubt whatever. It was not properly set up by Mr. Briggs; so that, even if all the parts, as manufactured by defendant, had been perfect, the whole, as set up in the plant, would have been defective. Mr. Trowbridge in his letter of June 28, 1908, page 996 of this opinion, says:

"The gas tank stands so close to exhaust muffler the gas (after engine runs a while) is heated to such an extent as to impair its value. The free air is also taken from immediately over exhaust pot thereby becoming heated to an injurious extent, both of which troubles will, in my opinion, have to be remedied to obtain satisfactory operation."

We have here a positive statement from defendant's expert and representative that, until the "troubles" here mentioned had been remedied, satisfactory operation could not be obtained. Defendant's learned counsel say that this defect of construction could have been easily remedied. That may be true, but the fact remains that, until an expert had discovered the trouble and remedied it, the engine did not work satisfactorily. But, even apart from this, the evidence leaves no doubt that the engine never operated satisfactorily. We think the evidence leaves little, if any, room for doubt that the gas producer was too small. The failure of the engine to develop the required horse power was due to this insufficiency of the gas producer, and not wholly, as pretended

by Mr. Briggs, to the quality of the coal. The testimony of the local coal dealers shows that the coal was of the quality which the contract provided should be used, namely, "clean nut anthracite coal." It was not pea coal, but pea coal is called for only by the consumption guaranty clause. It is not called for by the clause prescribing what kind of coal shall be used. The latter clause calls for only "clean nut anthracite coal."

The fact itself that Mr. Briggs remained 42 days at the plant, and that, even then, he left only because he was called elsewhere by defendant's work, shows pretty conclusively that the engine was not operating satisfactorily. Had it operated satisfactorily, Mr. Briggs would have left it as soon as he had sufficiently instructed Mr. Templeman in the manner of operating it, which certainly would not have taken 42 days or even a quarter of that time.

The only question, then, must be whether the plaintiff company has lost its right to exact the guaranty contained in the contract.

We attach no importance to the contention made that plaintiff allowed the brass parts that could be separated from the engine to be stolen while the machinery lay in their plant preparatory to being set up. Mr. Briggs makes such a statement; but adds that he has forgotten what parts were stolen. Mr. Templeman testifies that only one piece of brass was missing; that he does not know whether that piece was stolen or lost. Whatever this piece was, Mr. Briggs does not pretend to say that its absence interfered in any way with the operation of the engine. For all we know, it may have been a mere trimming or ornament.

Nor can the prescription of one year avail. Article 2534, C. C., provides:

"This limitation does not apply where the seller had knowledge of the vice and neglected to declare it to the purchaser."

The vice in the present case consisted in the inadequacy of the gas producer, and in

the defective installation of the machine. Of both of these defects the defendant must be held to have had full knowledge. The manufacturer of a machine is held to the knowledge of even latent defects (35 Cyc. 401); and the inadequacy of the gas producer must be held to have been patent to the defendant, though not to the plaintiff, since plaintiff was not supposed to have, and, in fact, had, no special knowledge of machinery. And the defendant must also be held to have known that the engine had been defectively installed. It was its duty to know it, and it had full opportunity to know it. It must, therefore, be presumed to have known it. Johnson v. Marx & Levy, 109 La. 1044, 34 South. 68.

But it is impossible from plaintiffs' conduct and letters to escape the conclusion that they accepted the engine and are liable for the price, notwithstanding the fact that the machine did not work to their perfect satisfaction. In their letter of May 17, 1907, transcribed at page 989 of this opinion, in answer to the letter of defendant inquiring as to the necessity of Mr. Briggs remaining with them longer, they spoke of the necessity of his remaining until their man who was to run the engine should have been sufficiently instructed, and said not a word about the engine not being satisfactory. When Mr. Eghert told Mr. Templeman that he was forever kicking and was talking through his hat, Mr. Templeman seems not to have considered his complaint as calling for more serious treatment. When Mr. Beall visited the plant in January, 1908, with a stranger who was contemplating the purchase of a similar engine, and asked Mr. Templeman what success he was having with the engine, Mr. Templeman said he "was getting good results." When in January and February defendant pressed plaintiff for payment of the credit part of the price and plaintiff was hard put to it for an excuse, or ground on which to ask for delay, nothing

was said about the engine not operating satisfactorily or of defendants not having fulfilled their part of the contract, although this would have been a good and obvious ground on which to claim delay in payment. On the contrary, plaintiffs expressly said in their letter of January 25, 1908, copied at page 991 of this opinion, that, if defendants brought suit, they would certainly get their money. In April, 1908, plaintiffs treated the machine as their own by adapting a gasoline tank to it, and running it in that condition for operating their plant. In their letter of April 28, 1908, copied at page 993 of this opinion, while they spoke of their having "been having considerable trouble with our plant owing to the fact that we have been unable to get a uniform grade of coal," they said not a word about the engine operating imperfectly. On the contrary, they spoke of having had one car load of coal that was satisfactory, and of their running at the date of the letter with gasoline. Their only complaint was that the gasoline was too expensive, and they inquired if defendant could not give them information how to run the engine with Texas oil or Texas lignite. And, finally, in their letter of May 12, 1908, copied at page 994 of this opinion, they said, "We have only been able to get one lot of coal on which we could run the plant satisfactorily," which was tantamount to an express declaration that with this lot of coal they had run the plant satisfactorily. From all this we say it is impossible to avoid the conclusion that plaintiff's present dissatisfaction with the engine has grown out of the fact that the engine has now by misuse become much impaired, so that it can no longer come even near fulfilling the guaranty of the contract. That it had become seriously impaired by the time plaintiff concluded to make a positive serious complaint, or, in other words, addressed themselves to the home office of defendant, calling upon defendant to fulfill the guaranty of the contract, there can be

no doubt. The testimony of Mr. Templeman must be read in the light of his present dissatisfaction, or, in other words, as exaggerating or aggravating more or less conditions which did not at the time impress him in the same way. If, before the engine was damaged, things were as bad as he depicts them, the plain duty of his company was to notify the home office of defendant, and put defendant in formal default; and not go on using the engine as was done "with the hope that time would prove that we had not made a mistake in putting this plant in."

We think that, after having used the machinery during 16 months for running their plant, it is too late for plaintiffs to offer to return it; and we think further that, under all the circumstances of the case, plaintiffs are not even in a position to claim damages. In the latter connection the case is analogous to that of Delambre v. Williams, 36 La. Ann. 331, where this court said:

"The record shows to our entire satisfaction that all the changes which were made in the work, all defects in the job had been fully considered · by plaintiff and satisfactorily accounted for and explained in his mind, and that he had knowingly and unequivocally accepted the work, and had settled for the same advisedly, and without any error or concealment on the part of the defendant. Hence his lips must be sealed from the utterance of any complaint.

"His counsel relied on the decision in the case of Levy v. Schwartz [34 La. Ann. 209], which he holds as precisely similar in its facts with the present case.

"But in that assertion he is mistaken. In that case the construction was not accepted and used without objection, and the plaintiff was not shown as in this case to have expressed his satisfaction with the work. We adhere to the principle therein announced that payment of the price will not by itself be conclusive of proof of a waiver of damages. But we do hold here, as we did there, that such a settlement must be considered as one of the links in the chain of evidence which demonstrates that by his acts in the premises this plaintiff has effectually waived all claims for damages."

Plaintiff really never placed defendant in default until by their letter of May 12, 1908, copied at page 994 of this opinion, when, for the first time, they called upon defendant to make good the guaranty of the contract. And we find that, when thus called upon, defendant agreed to send an expert to ascertain what, if anything, was the matter with the engine. The complaints of plaintiff to the local agents, or salesmen, of defendant, cannot be made to answer for a formal putting in default. These agents certainly never so understood. They do not seem to have taken the complaints as being at all of a serious character, or as placing the defendant company under the necessity of taking up the matter seriously. In fact, it is not shown that these local agents were anything more than mere salesmen, having authority to sell machines, but not to represent defendant in connection with machines already sold and installed.

Judgment affirmed.

SOMMERVILLE, J., takes no part herein.

### On Rehearing.

LAND, J. After a reconsideration of this case, we find no good reasons for reversing our previous conclusions as to the rescission of the contract.

[1-3] It is an undisputed fact that the plaintiff used the machinery for more than a year before offering to return it to the defendant. It is an undisputed fact that plaintiff paid several notes given for installments of the purchase price with full knowledge of many of the defects complained of in his petition. Plaintiff, therefore, must be held to have accepted the machinery. This action, however, did not deprive the plaintiff of the right to demand a reduction of the price under article 2541 et seq. of the Civil Code. In a redhibitory suit the judge may decree merely a reduction of the price. Id. 2543. The action for reduction of price is prescribed by one year, except where the seller had knowledge of the vice, and neg-

lected to declare it to the purchaser. Id. 2534, 2544. In our former opinion we said:

"The vice in the present case consisted in the inadequacy of the gas producer and in the defective installation of the machine. Of both of these defects the defendant must be held to have full knowledge, * * * and the inadequacy of the gas producer must be held patent to the defendant, though not to the plaintiff, since plaintiff was not supposed to have, and, in fact, had no special knowledge of machinery."

For these reasons, the court overruled the plea of prescription of one year against the action to rescind the contract of sale. For the same reasons the plea is bad against a demand for a reduction of the price. The case at bar is one where the defects known to the buyer in the quality of the thing sold were not of such importance as to induce him to refuse to accept the machinery; but the buyer by keeping the machinery did not waive his right to a reduction of the price. Civ. Code, § 2542. We therefore conclude that the plaintiff should be dispensed from the payment of the balance of the purchase price.

It is therefore ordered that the judgment below be reversed, and it is now ordered that there be judgment in favor of the plaintiffs, canceling the unpaid balance of the purchase price as claimed by defendant in reconvention, and condemning the defendant to pay costs in both courts; and it is further ordered that all other demands of the parties in this suit be rejected and dismissed.