Nos. 772-873

First Circuit

———

STANDARD MOTOR CO. v. ST. AMANT

———

(May 5, 1931.   Opinion and Decree.)
(June 16, 1931.   Rehearing Granted.)
(December 8, 1931.   Opinion and Decree on
Rehearing.)

———

J. Y. Sanders, Jr., of Baton Rouge, attorney for plaintiff, appellant.

C. V. St. Amant, of Donaldsonville, attorney for defendant, appellee.

MOUTON, J. June 22, 1927, defendant bought a secondhand Dodge sedan from plaintiff company for $650 on which he paid $150 cash, leaving a balance of $432, for which he gave twelve notes of $36 each, payable monthly. He paid six notes and stopped further payments. This suit is brought against defendant on the six notes subsequently due which represent the balance on the purchase price of the auto.

The prayer in the answer of defendant is for a rescission of the sale, and a rejection of the demand.

The judgment below was for a reduction of the price to the sum of $216, the amount claimed, which was denied.

Plaintiff appeals.

In a redhibitory suit, the judge may decree merely a reduction of the price. C. C. art. 2544. Ehrlich et al. v. Roby Motors Co., 166 La. 557, 117 So. 590.

In the answer of defendant it is alleged that the auto was in an "unusable condition," was mere "junk," and had never run satisfactorily from the time of its delivery. These averments present the issue of redhibition which authorized the decree for a reduction of the price, particularly as the evidence introduced in the case was in support of that defense.

"Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." C. C. art. 2520.

In every contract of sale the seller warrants the thing sold against hidden defects or its redhibitory vices. C. C. art. 2476.

In the case of Crawford v. Abbott Automobile Co., 157 La. 59, 101 So. 871, the court said:

"Unless warranty is expressly waived seller warrants that the thing sold is fit for the purpose intended."

In that case in which reference was made to a secondhand machine, the thing sold here, the court said:

"A secondhand article must be fit to do the work intended," which was approved in Jackson v. Breard Motor Co., Inc., 167 La. 857, 120 So. 478.

In the 157 La., above cited, the court said also that the "buyer need not show particular cause of defects which make thing sold unfit for intended purpose, particularly when that thing is complicated machinery; proof of actual existence of such defects being sufficient."

Edmonson, the salesman who sold the auto to defendant, says he told the latter at the time of the sale that it was in first-class condition, but that he did not "guarantee it." Whether or not he gave any such guaranty, the contract carried with it the implied warranty that it was in running condition and "fit for the purpose intended." This warranty was necessarily implied in the sale under the ruling in the

cases, hereinabove referred to, as there was no waiver of warranty between the parties, expressed or implied. The term "fit for the purpose intended," we understand to mean the ordinary general use of an automobile, and not for use in any particular calling or business, unless it be so stipulated, as the warranty implied in the contract of sale is subject to any modification by the parties thereto. C. C. art. 1764, par. 2.

The defendant testifies that his troubles with the car began about two weeks after he had purchased it, which continued to increase until some time about the month of December or January following the sale when it could no longer be used and when he abandoned it and stopped payment on the seventh promissory note. His testimony is that he spent $300 in trying to remedy the troubles he was experiencing with the car, but all without avail.

P. T. St. Amant, defendant's nephew, says, about eight or ten days after his uncle had acquired the car in which he (witness) rode daily, the car began to miss and pump oil; that the pistons were worn out, and the rims and tires had to be changed.

Bell Gautreau, a tractor mechanic, having occasion to repair the auto, found that the rims were bad, which was in July, about two months after the sale. He had to take the cylinder head off the motor; says the pistons were loose, and that a valve was burned; that at every week-end there was some trouble with the car.

Breaud, an auto mechanic, says, when he first worked on the car, November 2, 1927, he had to replace eight valves, and later, in the following January and February, had to install on the car a timer, a cylinder gasket, and one valve. This mechanic admits that running a car without oil or water could, to a certain extent, place a car in that condition.

Stanhope, a general mechanic of long experience, and who operated a garage at Gonzales, worked on the car at various times. His testimony is that the exhaust valves were burned out, that the wiring "was rotten," and that he worked so often on the car that, to use his expression, "it was a botheration to me." Stanhope was living at the time in Gonzales near the office of the defendant, Dr. St. Amant. He says he remembered when the defendant bought, about June, 1927, a Dodge touring car. He says, however, that to the best of his knowledge defendant owned no other Dodge car at that particular time. His testimony shows that his work was done on the Dodge sedan, the car in question.

Counsel for plaintiff contends that the condition in which the car was, as reflected by the testimony of these various witnesses, could have been brought about by a variety of causes.

Breaud, testifying for defendant, said that running a car without water or oil could place it in that condition. There is no evidence to show that either the defendant, Dr. St. Amant, or his nephew, who drove the car almost every day after its purchase, ever ran the car without water or fuel. There may be other causes which might bring about the condition which made its appearance in the car soon after the defendant began operating it. Such causes, if they existed, are not pointed out in the record, and, in reference thereto, we must say that there is no in-

timation whatsoever in the evidence, showing that the deplorable condition of that car was in any way the result of either careless driving, rough treatment, or inattention by defendant. On the contrary, it is shown that, from the time the first trouble was noticed by defendant, about two weeks after he had bought it, the bad condition of the car continued to increase until the following December or about that time, when it would not "run at all," was abandoned, and refusal to pay the seventh note followed.

The defendant testifies that work was done on the car in every garage from Gonzales to St. Amant, and that he actually spent $300 in his vain efforts to remedy the defects which interfered with the running of the car, finally culminating in its abandonment.

We think that plaintiff when it sold the car thought it was in running condition, otherwise it would be hard to explain why the salesman, Edmondson, who effected the deal would have represented it as being "in first class condition."

No doubt, defendant thought it was at least in running condition, else he never would have purchased it for the general use expected of vehicles of that character.

The causes or defects which soon after the sale affected the running condition of the car, and some months after actually put it out of commission, were certainly unknown to defendant when he bought 'it. The early manifestation of these defects which were not caused by defendant, as before stated, existed, as we must infer from the evidence, at the time of the sale or prior thereto, and were hidden or latent. The sedan sold was a thing of complicated machinery, and in such a case, as was said in Crawford v. Abbott Automobile Co., 157 La. 59, 101 So. 871, the "buyer need not show particular cause of defects which make thing sold unfit for intended purpose," etc.

Obviously, the running condition of the car could not be seen by defendant at the time of the sale, and could be found out only after it was used. The latent defects likewise could not be detected at that time and which made their appearance soon after when the car was subjected to the usual service which demonstrated that it was "unfit for the intended purpose." The defendant, however, not having to show the particular cause of such defects. Crawford v. Abbott Automobile Co., 157 La. 59, 101 So. 871.

Counsel for plaintiff says that when the auto was delivered it was in running condition. Running condition, we think, means a little more than that; a car should keep in running order, at least, for more than a couple of weeks after its purchase, when it has been properly taken care of, as appears to have been the case herein. The many defects, which soon made their appearance for the reasons hereinabove given, authorize the inference that the defects existed when the car was sold or before.

Counsel for plaintiff cites Civil Code, art. 2530, which says that the buyer must prove that the vice existed before the sale, and that, if it makes its appearance within three days immediately following, it is presumed to have existed before the sale.

The vice or defect in the auto did not appear in this car within three days; if it had, the presumption, of its existence

would have sprung into life, but, as we understand the law, the fact that it did not does not cut out the proof by inference from the evidence that the vice existed before the sale, which was the situation in cases cited by counsel, and others where machinery was sold and showed its defects quite a while after the sale.

In order to ground this case on the basis upon which it should be solved, we must revert to the contention of plaintiff that when the auto was delivered it was in running condition. From the language of counsel, it would seem that its delivery in that condition comprised the full extent of plaintiff's warranty under the sale.

Redhibition in a thing sold is a vice or defect rendering it absolutely useless, or its use so inconvenient and imperfect, it must be supposed the buyer would not have purchased had he known of the vice. C. C. art. 2520. This article clearly defines what a redhibitory vice or defect is, and the consequences therefrom which entitles the buyer to an avoidance of the sale.

Civil Code, art. 2476, provides for the warranty of the seller against the hidden defects or the redhibitory vices of the thing sold. If the thing sold is absolutely useless, or its use so inconvenient and imperfect, that it must be supposed it would not have been bought, it follows that the seller has not complied with his warranty. If the thing is so affected, it cannot be considered that the seller has sold a thing "fit for the purpose intended," unless the warranty has been expressly waived, as held in Crawford v. Abbott Automobile Co., 157 La. 59, 101 So. 871.

Grounding ourselves on this rule of law, and on our application of the evidence, as hereinabove stated, we now pass to the real issue determinative of the case.

In reference to the vital question presented, counsel for plaintiff contends that defendant by paying six of the notes, by his conduct after the sale, and by the effect of letters written plaintiff, he accepted the auto and cannot now repudiate the contract by pleading or urging any defects in the car.

Plaintiff relies confidently on the case of Templeman Bros. Lumber Co. v. Fairbanks, Morse & Co., 129 La. 983, 57 So. 309, to maintain that position; on the case of Champion Shoe Machine Co. v. Antonio Culmone, 1 La. App. page 484, wherein the decision is based on the Templeman case above cited; on the case of Edward C. Hooper v. Dry Hand Mop Co., 1 La. App. 621, in which that principle is recognized and on the case of Bay Shoe Co. v. Nacol, 4 La. App. 58, the last one decided by this court, recognizing the foregoing doctrine.

Plaintiff relies principally on the Templeman case, 129 La. 983, 57 So. 309, 315, which he contends presents many features similar if not identical, to those appearing herein. In that case, it was shown that more than a year after the purchase of the machine, the buyer, being threatened with suit, wrote the Fairbanks Company, its vendor, for an extension of time for the payment of the purchase price. In the letters of Templeman, the purchaser, to plaintiff company, not the slightest complaint is made about the engine not working satisfactorily, or of the vendor, Fairbanks Company, not filling its contract. Complaints to the local agent, the record shows, had been made by Templeman Bros., but the court said they should have been made to the home office of the Fairbanks

Company, as the agents appeared to have represented their company as mere salesmen, and not in connection with machines already sold and installed.

In this case complaints were made to Edmonson, the salesman of the auto, by Dr. St. Amant, the purchaser, but counsel says it had no legal effect, as they should have been addressed to the home office of plaintiff company at Baton Rouge, only twenty-seven miles away.

The evidence shows that defendant, not only made complaints to plaintiff's local agent, but that about October 1st, some three months after the sale, he sent his nephew, P. T. St. Amant, to plaintiff's office in Baton Rouge to lodge his complaint. The officers of the company being absent, St. Amant asked the stenographer to tell them that defendant did not want the car. Sending this messenger to the home office of plaintiff company for the purpose stated indicated very clearly that plaintiff was dissatisfied with the car, and did not intend to accept it. This fact, taken in connection with the previous complaints to Edmonson that the car was not rendering the services expected shows that defendant did not want the car, in which he was justified, considering the condition of the car at that time.

It is true that on January 27, 1928, in answer to a letter from plaintiff pressing defendant for payment, defendant, in a reply to that demand, wrote that "due to my slow collections, is the reason I'm behind with my notes; am trying to force collections since the election is over." The date of this letter corresponds with the maturity of the seventh note when defendant stopped payment. Although the act of sale of the auto provides for the maturity of all the notes if the purchaser defaulted in the payment of any one of them, this suit was only instituted in July, 1928, and the answer was filed in October, 1928, more than one year subsequent to the sale, after the prescriptible period had run, precluding an avoidance of the contract for redhibitory defects, and compelling defendant to relief by demanding a reduction of the price.

Defendant admits in his testimony that the first written complaint he made to plaintiff company was by letter of date June 30, 1928, more than a year after the act of sale, which was executed June 22, 1927. The probabilities are that defendant got wind of the intended suit which was filed in July, 1928, and addressed that later to plaintiff company, which had allowed the notes to run more than six months after they became exigible by reason of the failure of defendant to honor the seventh note, although the letters of the plaintiff show that it was insistent in demanding the payment of the notes soon after they became overdue.

In referring to the defendant stopping payment of this seventh note, it must be noted that about that time, after making repeated efforts to remedy the defects so as to put the car in a running condition, the defendant then abandoned the car, or stopped using it, because, as he testified, he could not run it at all.

In connection with our reference to the condition of this auto at that time, it is proper to quote from the Templeman Bros., case, as follows: "But," says the court, "it is impossible from plaintiffs' conduct and letters to escape the conclusion that they accepted the engine and are liable for the price, notwithstanding the fact that

the machine did not work to their perfect satisfaction." The words above quoted which we desire to emphasize are these: "The machine did not work to their perfect satisfaction."

Here the auto did not run to the satisfaction of defendant from the very beginning, and, after repeated failures to remedy the defects which had manifested themselves in various forms, it would not run at all, became "absolutely useless," as expressed in the Code, was actually abandoned and junked, as it is alleged in defendant's answer.

Is it fair or reasonable to believe that defendant had finally accepted that machine in such a condition?

His conduct indicates that he was liberal in the expenditure of his money at the different garages for repairs, thinking that the defects would be finally remedied, and that the machine would be put in running order, but it is impossible to conclude that after he stopped payments, and had abandoned the machine, he was willing to accept it and pay the balance of the purchase price. We must hold otherwise, and affirm the judgment appealed from, which allowed a reduction of the price to the amount sued for and rejected the demand.

---

## ON REHEARING

LeBLANC, J. We find the case to be properly stated in the original opinion heretofore handed down, and it is unnecessary to here re-state it. 134 So. 279. We find also that we correctly stated what we construe the law to be with reference to the implied warranty that follows the sale of a secondhand automobile, and that in a suit of this nature the court may decree merely a reduction of the price instead of an avoidance of the sale. We find, however, on further consideration, that we did not make a proper application of the law to the facts as we now view them, particularly with reference to lack of formal and serious complaint on the part of the defendant about the (according to him) almost utterly worthless condition of the automobile which developed two weeks after the sale, his continued use of it under the circumstances, his payment of his notes as they matured for six months, and, finally, his letter written to plaintiff seven months after the sale, which, instead of being a protest against further payments, can hardly be construed into anything else than an excuse for his delay in making remittance and a request for further extension.

Dr. St. Amant states in his testimony on direct examination that "some time in December or January," meaning December, 1927, or January, 1928, he "quit using the car altogether." The automobile, as we recall by reference to the original opinion, was purchased June 22, 1927, six or seven months before he claims to have stopped using it altogether. In face of this testimony given by him, we nevertheless find him writing a letter to the plaintiff on January 27, 1928, which, because of its persuasive proof that he must have been mistaken as to the time he claims to have given the car up, we reproduce in full:

"Gonzales, La. 1/27/28

"Standard Motor Car Co., Baton Rouge, La.

"Dear Sirs: Due to my slow collections, is the reason I'm behind with my notes; am trying to force collections since the election is over.

"Hoping this will be satisfactory,

"Yours truly,

"(Signed) G. S. St. Amant."

The letter speaks for itself. There is certainly nothing in it to suggest in the slightest degree to the plaintiff that Dr. St. Amant was in any way dissatisfied with his purchase. To the contrary, it expresses an almost direct intention on his part to go on making his payments. If it be conceded that his alleged complaints had been transmitted to the plaintiff, would it not have been reasonable for the latter to assume that whatever trouble the car was giving had been remedied and that everything was now all right?

It is difficult to believe that a business or professional man, especially a country doctor, who is almost in constant need of his car, would go on paying note after note on the purchase price of an automobile and then excuse himself for a delayed payment, if the car was in the condition Dr. St. Amant and his witnesses would have it appear that this car was. It is difficult to reconcile his actions with his testimony. We take Dr. St. Amant's word for it, when he says that he did have some trouble with the car, but, to use the language of the Supreme Court in the case of Templeman Bros. Lumber Co. v. Fairbanks, Morse & Co., 129 La. 983, 57 So. 309, which resembles this case in many of its features, his testimony "must be read in the light of his present dissatisfaction, or, in other words, as exaggerating or aggravating more or less conditions which did not at the time impress him in the same way." In that case, it is observed, the seller had knowledge of the defective machinery sold, and was given every opportunity to remedy it, having sent two of their expert mechanics to work on it, both having remained several weeks trying to make the engine develop the horse power it was represented as having when sold. And yet the Supreme Court held that, as the purchasers had gone on and used the engine for more than a year, during which time they paid several installments, it was too late for them to offer to return it. As in this case, it appears that there had been some complaints made to the local salesman of the dealer, but the court held that complaints so made could not be made to take the place of a formal putting in default. In the case before us, not only was the seller never given a chance to remedy whatever trouble there may have been with the automobile, but he never had any formal notice from the buyer that there was any trouble at all until the matter had been placed in the hands of lawyers for attention and they had written defendant a letter to that effect. This, as appears from the correspondence, was just a few days prior to the filing of this suit.

It is true that in the case of Templeman Bros. Lumber Co. v. Fairbanks, Morse & Co., supra, the court, on rehearing, relieved the purchaser from further payments, and in effect decreed a reduction of the price, as did the lower court in this case, but that was because, as stated in the opinion, the seller was held to the full knowledge of the defects in the particular piece of machinery sold, which had been complained of. There is no evidence here by which the seller could be charged with such knowledge. On the contrary, the testimony is to the effect that, at the time the car was sold, it was in good running order and condition, and the purchaser was given the option, before buying, of having it examined by any mechanic of his own selection.

We have examined the cases cited by counsel for defendant, and note that several hold that, even after having made several payments on the price of the article

bought, the purchaser should be relieved from the sale where there appear defects which make the thing sold so useless or its use so imperfect that it must be supposed that he would not have bought had he known of the vices. But to relieve the purchaser in this case, where the article sold was a secondhand automobile, in good running condition when it was bought and he used it, perhaps experiencing some trouble, but used it, nevertheless, for six months or more, paid his notes as they matured monthly, and even then writes a letter in which he, in effect, expresses his willingness to make further payments, would be carrying the doctrine stated in the cases cited further than it has heretofore been recognized.

We have reached the conclusion that the original opinion herein handed down was erroneous, and that the decision of the lower court should have been reversed.

For the reasons stated, it is now ordered that the judgment of the lower court which discharged the defendant from further liability for the payment of the notes herein sued on, as well as the original opinion of this court affirming the same, be, and they are both hereby, reversed, set aside, and avoided, and, it is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff, Lewis Gottlieb, doing business under the name of Standard Motor Car Company, and against the defendant, G. S. St. Amant, in the sum of $216, with 8 per cent interest per annum from January 22, 1928, and 10 per cent on the amount of said principal and interest, as attorney's fees, and all costs of this proceeding.