SARTAIN, Judge.
This is a suit for the rescission of a sale of a tank trailer purchased by plaintiff from the defendant, the return to plaintiff of the cash portion of the purchase price, and for damages sustained by plaintiff as a result of the failure of the tanker to perform according to specifications. Judgment was rendered in the lower court ordering the contract rescinded, condemning the defendant to pay to plaintiff the cash provision of the purchase price of $7,-721.09, reimbursement of expenses of a test trip of $470.35, and insurance expenses of $1,423.00 totaling $9,614.44; and, the additional sum of $30,000.00 representing other unspecified damages.
Defendant does not here complain of the judgment rescinding the contract and the award of $9,614.44 to plaintiff. Defendant does complain that plaintiff has failed to bear the burden of proving that the damages it sustained resulted from the improper *894 operation of the tanker. Alternatively, defendant submits that in the event plaintiff is entitled to damages those damages should be limited to the following items:
“Calculated loss incurred as a result of 1964 beer operations per Cub Beverage Co. data $30,263
Deduct:
Fixed expenses which might have been incurred if Cub Beverage Co. had not entered the beer business:
Rent $1,600
Office salaries 572
Truck and sales salaries 3,941
Adjustment to advertising expense 1,651
Adjustment to utility expense 1,179
Excessive charge for carbon dioxide 150
Insurance premiums which were refunded 1,645
Taxes on dumped beer which could have been recovered 307 11,045
Calculated loss incurred as a result of 1964 beer operations after suggested adjustments not reflected in Cub Beverage Co. data $19,218”
Plaintiff has answered the appeal and claims that the amount awarded was inadequate and should be increased to in-elude:
“Attorney’s fees $ 2,900.00
Travel expenses 2,446.00
Materials, parts, etc., in adapting bottling equipment 6,147.00
Labor in adapting bottling equipment 5,890.00
Executive salary 5,515.33
Insurance, bonds, etc. 1,423.00
Advertising material 2,201.00
Supplies of bottles, etc. 32,586.00
Refund of amount paid on purchase price of trailer-tank 7,721.09
Cost of license, sales tax, etc., for purchase of truck-tractor 2,807.83
Cost of equipping and delivering trailer-tank 955.00
Loss in business operations 14,734.00
$85,326.25”
For reasons hereinafter stated we are of the opinion that plaintiff is entitled to receive only the sum of $9,614.44 because plaintiff has failed to prove that the balance of the damages it claims are incidental to or the result of the failure of the tanker to operate according to specifications.
Plaintiff’s owner and manager, Mr. Edward Streun, has been engaged in the *895 bottling and distribution of soft drinks in the Shreveport area since 1938. He first bottled and sold Pepsi Cola. In 1957 he obtained the Dr. Pepper franchise. Shortly thereafter he added a line of flavored carbonated drinks such as orange, grape and strawberry, etc. In 1962, he lost the Dr. Pepper franchise which reduced his total volume of sales by one-third. To pick up this slack, he did contract bottling for the next year. In 1963, he began investigating the possibility of purchasing beer in bulk, bottling it at his plant in Shreveport and then distributing it in his area using the same personnel and outlets. He ultimately decided upon a plan to purchase bulk beer from the Carta Blanca Brewery in Monterrey, Mexico and transport it via a refrigerated highway tanker to Shreveport. The beer was to be bottled directly from the tanker trailer.
Plaintiff contacted Transportation Equipment Company of New Orleans, the Louisiana distributor of The Heil Company of Milwaukee, Wisconsin, who manufactured highway tank trailers. Plaintiff contracted to purchase from defendant a tank trailer with a capacity of 5,050 gallons and the specified capability of maintaining constant product temperature of 32° F. with a maximum outside temperature of 115°.
Plaintiff made four trips to Monterrey, Mexico and encountered numerous problems with the tanker. However, the remaining principle objection is that the tanker was unable to maintain the beer at 32° F. On occasions the temperature of the beer reached 37° F while in the tank.
Plaintiff ordered a considerable amount of supplies including clear 6 ounce bottles with “Short Beer” appearing on the bottle in raised letters. He also purchased appropriate cases, cartons and display stands all specially designed to handle and display his product.
Plaintiff’s venture into the beer business was rather short lived. He picked up the tanker from defendant’s plant in April of 1963. He made four trips to Monterrey, Mexico. The first trip was admittedly a test run and the tanker was filled to only one-half of its capacity. On this occasion the beer arrived on Friday, was kept in the refrigerated tank until Monday when it was inspected by representatives of the Carta Blanca Brewery and determined to be unfit for consumption. Three more trips were made and on each occasion the beer was bottled, distributed and offered for retail purchase.
Shortly after plaintiff’s beer appeared on the market it began to receive customer complaints that the beer was “flat” and “skunky.” These complaints were well founded and ultimately caused plaintiff to discontinue the operation. Plaintiff contends that his entire trouble is the result of the failure of the tank to maintain the beer while in transient at the required 32° F.
On the other hand, defendant asserts that the failure of the tanker to maintain the beer at the required temperature was not the reason for the bad beer. Defendant contends that the bad beer was the result of Mr. Streun’s lack of knowledge and inexperience in the handling and bottling of beer.
The testimony in this case clearly supports the defendant’s position because all of the experts agreed that the factors of air control, copper contamination, exposure of light, and temperature control of the bottling process are vital to any successful beer bottling operation.
The trial judge while recognizing that the tanker failed to perform as specified also stated that “a portion of plaintiff’s trouble was the result of a lack of knowledge on plaintiff’s part concerning the bottling and packaging of beer.”
The greater portion of the testimony in the record consists of that of expert witnesses in the field of refrigeration and brewing. It is apparent to us that the question of refrigeration of the beer while in transient was not a contributing cause to plaintiff’s failure and we will not detail *896 here the technical reasons for the failure of the tanker to perform as specified or the corrective measures offered by the experts to cure this deficiency. It will suffice to say that whereas one load of beer arrived at plaintiff’s plant at 35° F, it gained 7° as it passed through plaintiff’s machinery so that the temperature at the filler head in the bottling plant was 42° F. Also, the last load arrived in Shreveport at 36° F, was bottled, tasted good, and was marketed.
The brewing experts that testified were unanimous in their opinions that air contamination, copper contamination, exposure to light, and quality control equipment were essential. The record also clearly reveals that plaintiff’s operation was grossly deficient to cope with these factors.
The evidence is quite clear that when beer is exposed to air substantial adverse changes in its flavor occur after bottling due to oxidation. This is so even though the beer that is initially bottled tastes good. The problem of keeping air out of beer during the bottling process is one of utmost importance. Plaintiff’s problem in this regard was aggravated because of the use of a small bottle (6 02.) which permits more than the average amount of air.
The witnesses were also unanimous in their opinion that copper contaminates beer by acting as a catalyst in hastening oxidation. The tubes and filler bowl in plaintiff’s bottling equipment were both made of copper which increased this problem.
It also was noted by the experts that when beer is exposed to light by being contained in a clear bottle, portions of the beer decompose and emit an odor. It is for this reason that most beer is sold in colored bottles with wrap-around containers.[1] Plaintiff’s bottles were made of clear glass and the carton permitted 40% of the bottle to be exposed.
The last and final item deals with plaintiff’s lack of quality control which meant that during the bottling process plaintiff did not possess the capability of testing the air content, the temperature of the beer at all stages, and particularly the control and recordation of pasteurization temperatures. The only quality control plaintiff was able to exercise was that of a carbon dioxide test. The principle purpose of quality control is to enable the brewer to detect troublesome batches of beer, take corrective measures, or eliminate the beer from the market if the indicated problems cannot be corrected.
Plaintiff endeavored to convert equipment used for the bottling of carbonated beverages for the bottling of beer. Plaintiff did endeavor to adopt its equipment but these adaptations were most ineffective. Mr. Brenner, defendant’s expert witness, after examining plaintiff’s equipment carefully, testified that he did not believe that Mr. Streun had “any real concept of what quality procedures mean nor the stringent controls that are required to stay in the business of this kind.”
The defects noted above are in part admitted by plaintiff through the testimony of Mr. Streun who stated that he contemplates going back into the beer business but not with his present equipment.
Thus it is evident to us that plaintiff has failed to bear the burden of proving that the damages it sustained are consequential to the failure of the tanker. As a matter of fact the evidence clearly preponderates to the contrary and that it was these other factors that led to plaintiff’s unsuccessful venture.
With the above facts in mind, we determine that Civil Code Articles 2545, 2547, and 1934 are applicable to the case at bar. Article 2545 provides that the seller, who knows the vice of the thing that *897 he sells and omits to declare it, is required to make restitution of the purchase price and repayment of expenses and is also answerable in damages. Our courts have determined that the manufacturer is presumed to know the vice or defect in the article it constructs, manufactures or builds. See Tuminello v. Mawby, 220 La. 733, 57 So.2d 666; Templeman Bros. Lumber Co. v. Fairbanks, Morse & Co., 129 La. 983, 57 So. 309; Doyle v. Fuerst & Kraemer, 129 La. 838, 56 So. 906, 40 L.R.A.,N. S., 480. Article 2547 refers to the rules laid down on the subject “Of Conventional Obligations” and more particularly Article 1934, which provides that the manufacturer is liable for damages that are the “immediate and direct consequence of the breach” of the contract.
The trial judge in applying these articles determined that the plaintiff was entitled to rescission of the contract and to such expenses as were related thereto which amounted to $9,614.44 and in this respect we affirm his decision. However, we find that the trial judge erred when he determined that plaintiff was entitled to the additional sum of $30,000.00 as damages because these damages were occasioned by the fault, inexperience, and inadequate equipment of plaintiff and therefore were not foreseen at the time of the making of the contract for the purchase of the tanker nor were such damages the immediate and direct consequence of the failure of the tanker to maintain the beer at the proper temperature.
It is agreed by Transportation Equipment Company, Inc. that whatever judgment should be assessed against The Heil Company should also be granted against it as well.
Accordingly, for the above and foregoing reasons the judgment of the district court is amended to reduce the amount of the award in favor of plaintiff to the sum of $9,614.44, said judgment to be against The Heil Company and Transportation Equipment Company, Inc., jointly and in solido. In all other respects the judgment of the trial court is affirmed. The cost of this appeal is to be borne by the plaintiff with the defendants bearing the cost incurred in the district court.
Affirmed in part, reversed in part and rendered.

. Save for Miller’s High Life, who use a patented process which makes its beer less susceptible to light damage. It was noted, however, that even Miller markets its beer in wrap-around containers.