251 So.2d 166 (1971)
259 La. 660
Charles W. JOYNER, Plaintiff-Appellee-Respondent,
v.
AETNA CASUALTY & SURETY COMPANY.
Arthur W. BECK, Jr. and United States Fire Insurance Company, Defendants-Third-Party Plaintiffs, Appellants-Relators,
v.
WEDGEWOOD PARK CONSTRUCTION CO., Morehead Pools, Ltd., et al., Third-Party Defendants, Appellees-Respondents.
No. 50952.
Supreme Court of Louisiana.
June 28, 1971.
Rehearing Denied August 12, 1971.
Lunn, Irion, Switzer, Johnson & Salley, Richard H. Switzer, Shreveport, for defendants-relators.
Cook, Clark, Egan, Yancey & King, Sidney E. Cook, Johnston, Johnston & Thornton, James J. Thornton, Jr., Blanchard, Walker, O'Quin & Roberts, Wilton H. Williams, Jr., Mayer & Smith, Alex F. Smith, Jr., Bodenheimer, Jones, *167 Klotz & Simmons, G. M. Bodenheimer, Jr., Shreveport, for defendants-respondents.
TATE, Justice.
The determinative issue before us concerns the liability of a contractor to an owner for a premise defect which develops shortly after the construction contract is completed; more particularly, the burden upon either or both of these parties to prove whether such a defect resulted from a construction fault (for which the contractor is liable to the owner), or instead from misuse after completion of the contract and delivery of the premises to the owner (for which the owner bears the loss).
We granted certiorari, 257 La. 260, 242 So.2d 242 (1970), to review the dismissal of a third-party demand. By it, the defendants, the owner (Beck) of an apartment complex and his liability insurer, sought indemnity from a contractor and subcontractor who had constructed a swimming pool on the premises. The owner and his insurer had been cast in damages to a tenant (Joyner) for personal injuries resulting from a defective diving-board, but their third-party demand against the contractor and subcontractor was rejected. 240 So.2d 545 (La.App.2d Cir. 1970).
The facts are relatively undisputed.
The diving accident occurred on July 24, 1968 at the Brighton Manor Apartments. This 122-apartment complex had been opened for occupancy in March, some four months earlier. Joyner, the plaintiff tenant, was injured when a support (fulcrum) for the front of the diving board broke as he made a normal forceful dive.
There had been no previous indication of defect. The diving board had been constantly and heavily used for a little over three months at the time. There is evidence that, on some two-three previous occasions, the board was overloaded by adult tenants in horseplay; but the proof does not preponderate that such misuse was the sole or even a contributory cause of the accident.
In denying recovery, the court of appeal found that the owner Beck had not proved that the cause of the accident was improper installation, defective materials, or inadequacy for apartment-complex use. In so holding, the intermediate court essentially relied upon the absence of proof definitely pointing to any of these factors as the cause of the accident.
With regard to the occasional misuse by tenants, the court stated: "While this [misuse] is not shown beyond a possibility as a cause of the failure of the fulcrum [diving-board support], nevertheless, in the absence of substantial proof to the contrary, these facts constitute a factor to be considered in determining whether or not the proof is sufficient to conclude the manufacturer or installer of this equipment may have been at fault." 240 So.2d 548.
In essence, the intermediate court summarized the evidence as failing to show preponderantly any particular cause of this collapse of the diving-board support after only three months' use.
The record does indicate a number of possible causes, including tenant misuse, and including also, as will be noted, causes by way of improper installation.
The court felt that the owner had not sufficiently proved that any particular installation defect was the cause of the sudden break of the support so soon after installation.
If the owner does indeed bear the burden of proving what particular fault caused this sudden break of new equipment, the trial and intermediate courts were correct in holding that the owner has not preponderantly proved that installation or material defect was the cause of this accident and in dismissing the owner's third-party demand against the contractors.
In so holding, however, the previous courts overlooked that, under the present *168 circumstances, an inference of faulty workmanship or material arises when construction designed as a permanent installation fails shortly after being put into use. Town of Slidell v. Temple, 246 La. 137, 164 So.2d 276 (1964); Saunders v. Walker, 229 La. 426, 86 So.2d 89 (1956); Plunkett v. United Electric Service, 214 La. 145, 36 So.2d 704 (1948). See also Thompson v. Burke Engineering Sales Co., 252 Iowa 146, 106 N.W.2d 351, 84 A.L.R.2d 689 (1960). The effect of the inference is to place upon the contractor the burden of establishing that the soon-appearing defect in the work and the resultant damages did not result from his faulty workmanship or materials but instead from other cause.
In the present instance, this burden has not been met.
As earlier noted, instances of tenant misuse of the diving equipment by overloading it are shown, but the evidence does not preponderate (i. e., does not show this to be more probable than not) that such misuse was either the sole or a contributory cause of the accident.[1] Thus, the inference of fault is not dispelled by proof that, after the construction left the contractor's control, its condition was changed; so, therefore, the defect could as plausibly be ascribed to cause other than construction fault.
We should at this point advert to the evidence, insofar as it relates either to fault on the part of the (sub)contractor or else to the latter's failure to exculpate itself from any inference of fault arising from the soon-collapse of the support for the diving-board.
Beck, the defendant owner, had entered into an oral contract with Wedgewood (a construction corporation largely owned by him) to build the 122-unit Brighton Manor Apartments for him. Wedgewood, represented by one Malone, entered into a written contract with Morehead Pools, Ltd., for the latter to build two swimming pools for $9,750, according to the specifications furnished by Wedgewood. Morehead is shown to specialize as a swimming-pool contractor, being perhaps the largest such firm in the state, building and installing several hundred swimming pools a year.
Wedgewood and Morehead participated in selection of the design and the materials. The evidence shows, however, that the pools, equipment, and specifications were satisfactory for the purposes contemplated, if installed properly and with non-defective parts. (This evidence negatives contributory fault in design and specifications on the part of Wedgewood or the owner Beck.)
The diving board in question was a ten-foot length resting on two metal supports, the front one of which later broke. These supports were made of tubular stainless steel, bent at each side to resemble three sides of a rectangle.
The legs of these supports were set in concrete, with the diving-board resting on the cross-bars. The rear of the diving-board was bolted to the cross-bar of the rear support, i. e., the "anchor". The mid-portion of the board rested on the cross-bar of the front support, i. e., the "fulcrum" (or rather on a rubber fulcrum pad placed on the fulcrum's cross-bar). It was this front cross-bar which suddenly broke as the tenant Joyner was diving, causing him serious personal injuries.
The evidence shows that, to avoid undue metal stress through use, it is important that these steel supports be installed, in accordance with manufacturer's specifications, at a certain distance and at a certain height and level and parallel in line with one another.
*169 For instance, the manufacturer's specifications call for the fulcrum to be set at a distance of 52" from the anchor, with the anchor to be set 15¼" above the concrete and the fulcrum to be set 16¼". If the fulcrum were set lower or higher than the recommended variation between it and the anchor, or further from or closer to the anchor, then normal use can cause metal fatigue and stress concentration and, therefore, a metal support breaking because of such undue stress. (We note here that every expert testifying thought that a potential cause of the sudden clean break of the fulcrum was fatigue failure.)
Morehead failed to produce a single witness to testify that the diving-board supports were installed in accordance with specifications and in correct alignment and at correct distances. Nor did any other witness so testify. Morehead, in fact, failed to call any witness whatsoever who had participated in construction of the pool, except its foreman Helms, who testified only generally as to the course of construction. Helms testified that he did not inspect to verify the supports were correctly set but that "just from a glance they appeared to be satisfactory". Tr. 609.
As to the diving-board supports, this foreman Helms testified that they were to be installed in advance of the pool construction proper, just before the general contractor laid the concrete in the pool area and in advance of the pool construction proper. He testified that, at the contractor's request, he brought the supports three times to the pool site to install them, but in each instance he had returned them to the Morehead warehouse because the general contractor was not yet ready to lay the concrete.
Helms was supposed to install these supports in accordance with specifications. He admitted he knew it was important that the supports be installed in accordance with the precise specifications furnished by the manufacturer. Tr. 616.
Helms did not actually install the diving-board supports, because he had to leave town the next time the contractor called for them. Instead, he gave them to Chandler, Morehead's service manager, with instructions how to set these supports in the ground in advance of the concrete pouring. Chandler then took to the poolsite the supports and the manufacturer's printed specifications on installation.
On Chandler's arrival there, he found that the concrete crew was still not ready to pour the section of the walk in which the supports were to be set. He testified that, therefore, he turned over the supports to an unidentified workman at the job and wrote down with his pencil the measurements for installation.[2] He never inspected them, although he said, "just looking at it as I went by" on a later errand, they appeared to be installed satisfactorily. Tr. 642.
Two of the cementing contractor's employees were called to testify. Tr. 841, 852. One of them remembered that two of Morehead's employees had installed supports just before the concrete was poured. Tr. 849. Both were positive that no one on the cementing crew had installed the diving-board supports.
The supports, including the fulcrum that shortly broke, were thus installed by some person or persons unknown. Morehead never inspected them to verify that they had been set in accordance with the precise *170 specifications required for their proper installation. It is undisputed that it was Morehead's contractual responsibility to construct the diving board properly, and Morehead's alone.
We conclude that Morehead, the (sub)contractor responsible for installation of the diving board, did not exculpate itself from fault in the installation of equipment which broke so shortly after being put into use. In so holding, we primarily rely upon the testimony of noninspection and the lack of testimony by which the trier of fact could find proper installation. We also note, however, that, when the fulcrum broke and Morehead's employees immediately replaced it (at Morehead's cost), these employees did not testify that the prior fulcrum had correct placement.
We should at this point note that erroneous rulings by the trial court as to the introduction of evidence deprived the trial jury of certain expert testimony. This evidence was, however, preserved for appellate consideration by an offer of proof. La.C.C.P. Art. 1636.
The experts testified that, from photographs[3] of the broken fulcrum, they thought that the sudden happening of the clean break seemed to have resulted from fatigue failure (metal fatigue). Fatigue failure results when repeated stress weakens the metal to the point where, upon appliance of even normal pressure, it suddenly snaps.
The experts were produced by the metal suppliers to prove possible causation of such metal fatigue and fatigue failure. The trial court held that such evidence was not admissible to prove that improper installation could have caused fatigue failure, because the proponents had not first proved the snapped fulcrum was improperly installed.
This ruling is erroneous. The evidence definitely showed that the fulcrum had snapped. There was expert evidence indicating fatigue failure to be a potential cause of the snapping. The expert opinion evidence showing that improper installation practices (distancing or placing the fulcrums not in accordance with the specifications, nicking them in carrying them, unwrapped, back and forth to the warehouse three times, etc.) could have resulted in subsequent fatigue failure was both relevant and admissible.
See: 7 Wigmore on Evidence, Sections 1918-29, 1976 (3d ed., 1970); McCormick on Evidence, Section 13 (1954); 32 C.J.S. Evidence §§ 445, 546(11), 546(70); 31 Am. Jur.2d "Expert and Opinion Evidence", Sections 146, 151.
As earlier noted, the burden was on the contractor (and the subcontractor performing part of such contractor's obligation for him) to exculpate himself from defective material or installation for the immediate failure of the work performed. The evidence is thus admissible as indicating faulty installation as the cause of the sudden break of the diving-board fulcrum so shortly after its installation.
Whether or not such evidence, in connection with the sudden break, preponderantly proves the defective installation is not here an issue; for, even if it does not, the contractor has not produced evidence exculpating itself from the inference of faulty installation arising from the soon failure of the fulcrum.
Under Civil Code Article 2762, the contractor and the subcontractor chosen by it are solidarily liable for the construction failing due to defective installation or material.[4] Rinaudo v. Treadwell, 212 La. *171 510, 32 So.2d 907 (1947). Cf., Planiol, Civil Law Treatise, Volume 2, Sections 1910, 1911 (LSLI translation, 1959). Cf., Annotation, Swimming PoolContractor's Breach, 1 A.L.R.3d 870 (1965).
Nevertheless, as between the contractor and subcontractor, the latter is liable for the damages sustained through the faulty construction; both as the codebtor primarily concerned with the obligation, Civil Code Article 2106, and also by reason of an indemnity agreement by which the subcontractor Morehead obligated itself to hold the owner and the principal contractor harmless from any loss arising out of the performance of the contract by Morehead.[5]
The third-party plaintiffs, relators and appellants, further complain that the award of $75,000 to plaintiff Joyner for his personal injuries is excessive. Joyner suffered serious permanent injuries, involving heavy medical expenses and substantial loss of earnings, see court of appeal opinion at 240 So.2d 555-556. We do not find such an award to be an abuse of the trier of fact's large discretion. Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963).

Decree
For the foregoing reasons, we amend the judgment of the court of appeal (which affirmed the dismissal of the third party demand) so as additionally to provide: That judgment is rendered in favor of the third-party plaintiffs, Arthur Beck, Jr., and his liability insurer, United States Fire Insurance Company, and against the third-party defendants, Wedgewood Park Construction Co., Morehead Pools, Ltd. and Aetna Casualty and Surety Company (Morehead's liability insurer), holding these parties solidarily liable in the full amount, interest, and costs for which third-party plaintiffs are held liable to the plaintiff, Charles Joyner, upon his principal demand. All costs of these proceedings are to be paid by these third-party defendants.
It is further provided that, as between these third-party defendants, Morehead and its insurer, Aetna, shall hold Wedgewood harmless for any amounts for which the latter is held liable.
Court of Appeal decree amended and judgment rendered in favor of third-party plaintiffs and against third-party defendants.
DIXON, J., recused.
HAMLIN, Justice (concurring).
I note that in Footnote No. 3 of the majority opinion, it is stated: "Unfortunately, Moorehead's employees, upon removing the broken fulcrum, had sent it to the city dump on the day of or the day after the accident. Therefore, this fulcrum could not be located when searched for three weeks after the accident." This statement in the Footnote, in my view, is very important in resolving the issues in this case.
Moorehead's employees were the Company's agents; Moorehead, through its *172 employees, disposed of this vital evidence. It is my further view that Moorehead should have been more attentive to this accident. It leaps to the mind that this was crucial evidence upon which it could have built a defense in this case. Failing to preserve this evidence, it must bear the result of its own inattentiveness, negligence, laches, call it what one will. Therefore, resort to secondary evidence, photographs, became necessary.
Under the circumstances, I respectfully concur.

On Application for Rehearing.
PER CURIAM.
In our original opinion, citing authority, we held that "an inference of faulty workmanship or material arises when construction designed as a permanent installation fails shortly after being put into use. * * * The effect of the inference is to place upon the contractor the burden of establishing that the soon-appearing defect in the work and the resultant damages did not result from his faulty workmanship or materials but instead from other cause".
This holding was not intended to modify the requirement that before this inference of fault arises, the party claiming injury must establish by a preponderance of the evidence that after the construction left the control of the contractor upon its delivery to the owner, no fault independent of the contractor's workmanship or material (such as the injured party's own fault) caused the failure. The party injured must also, of course, prove by such preponderance that his damages were caused by reason of the failure of construction.
As our original opinion shows, this burden has here been met. The preponderance of the evidence negatives tenant misuse or other non-contractor conduct as a cause of the failure of the diving board so shortly after its installation. Since the preponderance of the evidence disproves a change in the condition of the construction after it left the contractor's control, the early failure of the work created an inference of faulty workmanship or material, with the result that the contractor must carry the burden of disproving that such was the cause of the collapse of the work and the ensuing damages.
With this clarification, we deny the application for rehearing.
NOTES
[1] We pretermit discussing the contention that, even if such tenant misuse were a contributory factor, the contractor should reasonably have expected such horseplay at a heavily populated apartment complex for young adults and should therefore have selected appropriate materials and equipment sufficient to avoid this foreseeable risk of causing hazard to safe use by others.
[2] Chandler's affirmative answer to the following summarizing question is uncontradicted anywhere in the record: "Mr. Chandler, let me see if I have got this straight. Is it your testimony that you took the fulcrum, the anchor, and the diving board out there under the instructions of your employer Morehead to install them. Instead of doing that, you met some fellow you never saw before and wouldn't know if you saw him again and delegated him the authority to set them in for your company, is that right?"
[3] The experts testified that, without metallurgical tests, they could not positively determine the cause of the sudden break. Unfortunately, Morehead's employees, upon removing the broken fulcrum, had sent it to the city dump on the day of or the day after the accident. Therefore, this fulcrum could not be located when searched for three weeks after the accident.
[4] There is some question whether before us is the question of the liability of those who fabricated and supplied the fulcrum to Morehead. The defendants had asserted a third-party demand against one or more of them, and so had Morehead. It is unnecessary for us to discuss this procedural issue, since the evidence shows defective installation to be at least equally plausible a cause of the sudden break as any original defectiveness of the material. The material suppliers, bearing no exculpatory burden, are thus not shown to be at fault. See Pilie v. National Food Stores, 245 La. 276, 158 So. 2d 162 (1963).
[5] Since we find that Morehead did not disprove its fault for the failure of the fulcrum, we do not reach the contention that, under the indemnity agreement, Morehead must hold the owner and contractor harmless even though not at fault. See Jennings v. Ralston Purina Co., 201 So.2d 168 (La.App.2d Cir. 1967). See also: Collins and Dugan, Indemnification Contracts, 50 Marquette L.Rev. 77 (1966); Annotation, 27 ALR 3d 663 (1969); Annotation, 143 ALR 312 (1943).