338 So.2d 946 (1976)
A & M PEST CONTROL SERVICE, INC., et al.
v.
FEJTA CONSTRUCTION CO., INC., et al.
No. 7590.
Court of Appeal of Louisiana, Fourth Circuit.
October 13, 1976.
*947 Baldwin, Haspel, Molony, Rainold & Meyer, Conrad Meyer, IV, New Orleans, for A&M Pest Control Service, Inc. and Dapper, Inc.
Bienvenu, Foster Ryan & O'Bannon, Hugh M. Glenn, Jr., New Orleans, for Hanover Ins. Co. and American Employers Ins. Co.
Hammett, Leake, Hammett, Hulse & Nelson, John I. Hulse, IV, New Orleans, for Fejta Const. Co., Inc.
Robert J. Young, Jr., Joseph R. McMahon, Jr., Edward L. Levert, Jr., New Orleans, for American Sprinkler Co. and Hardware Mutual Cas. Co.
Before LEMMON, GULOTTA and BEER, JJ.
GULOTTA, Judge.
DefendantsFejta Construction Company (general contractor), American Sprinkler Company (subcontractor) and its insurer appeal from a judgment in favor of plaintiffs for water damage to a building and its contents as a result of a break in a cast-iron elbow of a sprinkler system installed in the building by the subcontractor. We affirm.
Judgment was rendered in favor of American Employers Insurance Company, the insurer of the building; in favor of Hanover Insurance Company, insurer of the contents (conventional subrogees); and, in favor of Dapper and A&M, owners, respectively, of the building and its contents, for uninsured damages.
Judgments in favor of the owners and Hanover Insurance Company were rendered against all defendants jointly, severally and in solido. The award in favor of American Employers Insurance Company, however, was rendered only against American Sprinkler Company and its insurer, and not against Fejta. Because American Employers was the insurer of both the owner of the building (under a homeowner's policy) and of the general contractor (under a liability policy), the trial judge concluded that the obligation of Fejta to American Employers *948 was extinguished by confusion. American Employers appeals from that part of the judgment exonerating Fejta from responsibility to it.
Judgment was further rendered in favor of Fejta on its third-party demand against American Sprinkler and its insurer for the full amount for which Fejta was cast in judgment. The trial judge found that American Sprinkler in its subcontract had agreed to indemnify Fejta from any loss or damage caused by the installation of the sprinkler system. American Sprinkler claims, on appeal, that Fejta's negligence makes the indemnification clause of the agreement inoperative.
Before setting forth defendants' contentions, some factual background is necessary. The building owner and Fejta entered into an contract for construction of the building to be occupied by A&M Pest Control. An adjacent parking lot was not supported by pilings as was the building. After the pilings for the building had been driven and the building slab poured, but before the parking lot was constructed, the owner decided that he wanted a sprinkler system installed in the building. Fejta subcontracted the work of designing and installing that system to American Sprinkler. The record reveals that in the installation of a typical sprinkler system in new construction, the underground piping is laid before the building slab is poured. In this way, the underground pipe surfaces through the building slab into the interior of the building. However, in the system designed and installed by American Sprinkler, in the instant case, because the slab had been poured before the sprinkler system was installed, the underground pipe leading from the municipal water line rose vertically outside the building and then entered through the wall.
A 6-inch pipe ran underground from the water main for a distance of approximately 35 feet to a point below the ground near the outside of the building. At this point, 90 elbows brought the pipe vertically from underground and then horizontally through the wall of the building. Once inside the building, a 4-inch cast-iron elbow was used to turn the horizontal pipe vertically in order to connect to the main valve and the interior sprinkler network. The 4-inch cast-iron elbow immediately inside the building is the joint that ultimately reptured and caused the damage.
The system was installed in late December, 1966. In January, 1967, the building was accepted and occupied. A 200-pound pressure test was performed on the sprinkler system in March, 1967, and no leaks were revealed. The system functioned without any complaints until September 14, 1968, more than a year and a half after the system was completed, when the cast-iron elbow inside the building reptured.
In written reasons the trial judge stated:
"After reviewing all of the evidence this Court believes that the cast iron elbow was defective (having been defective before installation or having been broken during installation), that the parking lot subsidence created a downward pulling on the riser thus creating a tension in the system which led to its breaking at its weakest point, i.e. at the defective cast iron elbow.
"This Court believes that unions placed above and below the elbow, flexible couplings placed at the connection at the wall, and most importantly, a sleeve placed around the riser would have prevented the pulling on the riser and the creation of the tension on the sprinkler system which caused the bursting of the defective elbow and that the failure to make provisions for the subsidence effect on the sprinkler system pipe was a breach of the defendant's contractual duty to perform the work in a workmanlike manner."
The record supports this conclusion.
It is defendants' contention that plaintiffs failed to meet the burden of proof required in circumstantial evidence case, i.e., to produce sufficient evidence which excludes other reasonable hypotheses with a fair amount of certainty. Although conceding that the damage resulted from the reptured elbow inside the building, Fejta contends *949 that the evidence supports, in addition to plaintiffs' hypothesis, several other reasonable causes for the occurrence of the fracture, which were not the result of Fejta's negligence or lack of proper workmanship on the part of Fejta or American Sprinkler. We do not agree.

BURDEN OF PROOF
In actions under LSA-C.C. arts. 2762 and 2769,[1] plaintiff must prove his case by a preponderance of the evidence. Joyner v. Aetna Casualty & Surety Company, 259 La. 660, 251 So.2d 166 (1971); Rathe v. Maher, 184 So.2d 256 (La.App. 1st Cir. 1966), writ refused, 249 La. 201, 186 So.2d 159 (1966). In cases of this kind, as well as in tort actions, this burden may be satisfied through direct or circumstantial evidence. Town of Slidell v. Temple, 246 La. 137, 164 So.2d 276 (1964); Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971); Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (rehearing, 1972); American Security Insurance Company v. Griffith's Air Conditioning, 317 So.2d 256 (La.App. 3d Cir. 1975), writs refused, 320 So.2d 915 (1975) and 320 So.2d 916 (1975). As pointed out by Fejta, proof of the cause of the rupture in this case is circumstantial in nature.
The test of sufficiency in a circumstantial evidence case is set forth by the Louisiana Supreme Court in Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395, 397 (1963). In Naquin, the court said:
"* * * Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation."
See also Vonner v. State Department of Public Welfare, 273 So.2d 252 (La.1973). In Jordan, supra, the Louisiana Supreme Court stated, citing Naquin:
"* * * Whatever the descriptive term used, however, proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not."
Whether in an action under LSA-C.C. arts. 2762 and 2769 (implied warranty) or under LSA-C.C. art. 2315 (negligence), plaintiff is required to carry the burden of proof by a preponderance of the evidence, circumstantial or otherwise.
Causation, in this case, can only be inferred from circumstantial evidence surrounding the break. The building was unoccupied at the time of the incident and no one saw the elbow repture. Witnesses arrived on the scene after the break and found fragments of the shattered elbow and extensive flooding. Though the parties concede that the reptured elbow caused the flooding, the cause of the repture is the primary issue in contest.
In this connection, Dr. Oscar Albritton, an engineer and metallurgist, testified that he noticed, on examination of the reptured elbow, that one-third of the thickness of the elbow had oxidized or became rusted and the remaining two-thirds had not. From this observation, Dr. Albritton concluded *950 that two distinct fractures had occurred. According to this expert, the first one (rusty crack) had occurred at the time of installation when the threads of the 4-inch steel horizontal pipe were too tightly screwed into the threads of the cast-iron elbow, causing the brittle elbow to crack, or the elbow was defective because of an existing crack before installation.
Dr. Albritton further indicated that the second one (fresh fracture) occurred on the day of the incident. The doctor was of the opinion that the elbow cracked partially at the time of installation; but, that no leak appeared when the pressure test was performed on the system in March, 1967 (approximately two months after installation) because the "compression" of the completed system held the initially creacked elbow intact.
Robert Kuhn, consulting mechanical and electrical engineer, stated in a written report of his inspection of the site following the break that the parking lot slab had sunk "about two inches" from its original level. Based on Kuhn's report on subsidence, Albritton stated that subsidence from the ground below the unsupported (by pilings) parking lot caused the slab to sink, resulting in stress on the immobile pipes. He further concluded that the tension placed on the system caused a repture of the partially cracked cast-iron elbow.
Murvan Maxwell, an architect and fire protection consultant with regard to building codes, stated that flexibility in the underground connections would have allowed mobility of the pipes in the event of soil subsidence. Maxwell stated that use of flexible couplings and a sleeve[2] would have provided this mobility. According to Maxwell, the sinking parking lot slab poured directly in contract with the vertical pipe exerted a downward force on the vertical pipe.
We reject, as did the trial judge, the argument that plaintiffs' hypothesis does not exclude other reasonable causes for the repture advanced by defendants. According to Albritton and Maxwell, defendants' hypotheses are possibilities. However, the collective testimony of these experts indicated that the partially cracked elbow, together with soil subsidence and an immobile system, was the most plausible explanation for the cause of the repture.
In support of one of the theories advanced by defendants, Stanley Fejta testified that excavation work in connection with the installation of a sewer line was being conducted in the vicinity of the building at the time of the incident. He stated that he inspected the scene the day after the rupture and saw "teethmarks" on the exposed underground sprinkler line leading from the city water main to the building. From the presence of these marks on the pipe at an approximate distance of 25 feet from the vertical riser, and from the presence of a "backhoe" (a piece of heavy equipment used to dig trenches) in the area, the witness inferred that a blow had been administered to the underground sprinkler pipe in the course of the sewer excavation and that the shock had been transmitted to the elbow inside the building, causing it to crack. Significantly, however, the witness was unable to corroborate the existence of these marks. Though he claimed to have taken photographs of them, he was unable to produce them in court. Furthermore, Fejta's testimony was contradicted by Earl Hirsch, president of A&M Pest Control, who stated that there was no open excavation work immediately before or following the incident. We might add that Maxwell indicated that (assuming the backhoe struck the water line) the impact from the backhoe would be lessened by the absorption effect of the soil in which the sprinkler pipe was embedded. According to Albritton, assuming that the shock of the blow was transmitted to the vertical riser, it would have been more probable that the outside elbow of the system would have cracked before *951 the interior (provided no defect existed in the inside elbow). Furthermore, Albritton added that if the backhoe had struck the pipe, the fracture would have been immediate and not delayed. The record does not indicate the rupture occurred immediately following an impact.
Defendants also hypothesize that the rupture could have been caused by a vehicle striking the vertical riser in the parking lot. Fejta testified that he saw scratch marks and tire treads on the riser, indicating that vehicles had struck the vertical pipe, thereby causing the initial crack in the culprit elbow. This testimony again was contradicted by Hirsch who stated that he saw no marks on the riser and also that protective stanchions of sufficient strength were placed around the vertical riser as soon as the parking lot could be used. Furthermore, according to Albritton, assuming that vehicles collided with the riser, the repture of the system would have occurred immediately at the time of impact, rather than causing a delayed cracking, as in this case.
Under the circumstances, we conclude, as did the trial judge, that the circumstantial evidence on causation was sufficient to exclude other reasonable hypotheses with a fair amount of certainty. Plaintiffs carried the burden of proof on causation by a preponderance of the evidence.

SOLIDARY LIABILITY OF CONTRACTOR AND SUB-CONTRACTOR
Defendant, Fejta, seeks to be exonerated from responsibility for the reason that the sprinkler system was designed and installed entirely by American Sprinkler, and also because the owner's architect had approved the plans. Citing LSA-R.S. 9:2771,[3] Fejta argues that it performed the work according to plans furnished to it, which it did not make or cause to be made, and therefore, it is not liable for damage resulting from the defect in those plans. In rejecting this contention, the trial judge stated:
"In this case Fejta Construction Company, Inc. undertook the obligation of installing the sprinkler system and subcontracted the work to American Sprinkler Company who provided the plans and specifications for the system. Therefore, the plans and specifications of American Sprinkler Company for the installation of the sprinkler system are plans or specifications which Fejta `caused to be made' and the statute is inapplicable."
We agree. Furthermore, the defendant-contractor's liability for defects in workmanship is set forth in LSA-C.C. arts. 2762 and 2769. Recovery is permitted to the owner under these Codal provisions in implied warranty when the contractor fails to perform work in a workmanlike manner or to use materials fit for their intended purposes. In Joyner v. Aetna Casualty & Surety Company, supra, a case where a swimming pool diving board failed because of defective installation, the Louisiana Supreme Court, relying on LSA-C.C. art. 2762, held the contractor and sub-contractor solidarily liable. See also Rinaudo v. Treadwell, 212 La. 510, 32 So.2d 907 (1947). Based on the authority of LSA-C.C. art. 2762 and the Joyner case, we conclude that judgment making Fejta solidarily liable with American Sprinkler is proper.

INDEMNITY
The parties do not dispute the existence of an indemnity contract between Fejta and American Sprinkler, in which the *952 subcontractor agreed to indemnify Fejta for any loss incurred by the contractor in connection with construction of the sprinkler system. However, American Sprinkler contends that Fejta was negligent because of its failure to take any precautions to prevent sinkage of the parking lot slab. Accordingly, American Sprinkler reasons that Fejta's negligence makes the indemnity agreement inoperative. American Sprinkler contends further that indemnification does not occur where the indemnitee (Fejta) is wholly or partially at fault, in the absence of any express contractual requirement of indemnification notwithstanding the indemnitee's negligence. Because there was no such language in the contract, the subcontractor argues, no indemnification is owed. We do not agree.
As hereinbefore stated, under LSA-C.C. art. 2762, the contractor and subcontractor are solidarily liable to the owner for construction failures; however, as between the contractor and subcontractor, the subcontractor is a co-debtor primarily concerned with the obligation. By virtue of LSA-C.C. art. 2106, the subcontractor is "liable for the whole debt" and must indemnify his other co-debtor, the general contractor. See also Joyner, supra, 251 So.2d 171. Furthermore, because the trial judge did not make any specific finding of negligence on the part of Fejta and instead found the contractor liable only as a solidary obligor under LSA-C.C. art. 2762, we need not reach defendants' contention that negligence of the indemnitee vitiates the indemnity contract. Accordingly, we conclude, on the basis of LSA-C.C. art. 2106 and the indemnity agreement, that American Sprinkler owes full indemnity to Fejta. See Joyner, supra, and Bewley Furniture Company, Inc. v. Maryland Casualty Company, 285 So.2d 216 (La.1973).

CONFUSION
Finally, we find no merit to American Employers' claim that the trial judge erred when he failed to render judgment in its favor against Fejta. According to the trial judge, the obligation was extinguished by confusion because American Employers is also the liability insurer of Fejta. In our case, the qualities of debtor and creditor became fused in the same person, the insurer, and in such instance, confusion extinguishes the obligation. See LSA-C.C. art. 2217.[4] Though American Employers was not a party defendant in this action, Fejta's amended answer, which asserts that American Employers is its liability insurer, "sufficiently sets forth a set of facts from which a legal conclusion of extinguishment by confusion is found." See Norris v. Allstate Insurance Company, 293 So.2d 918 (La.App. 3d Cir. 1974), writ refused, 296 So.2d 832 (1974). Under the circumstances, we conclude that American Employers' qualities as a creditor (subrogee under plaintiff's homeowner's policy) and a debtor (liability insurer of the contractor) merged into one entity. Confusion operates to extinguish Fejta's obligation to American Employers. The judgment is affirmed.
AFFIRMED
NOTES
[1] LSA-C.C. art. 2762 reads as follows:

Art. 2762. Liability of contractor for damages due to badness of workmanship
"Art. 2762. If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks."
LSA-C.C. art. 2769 reads as follows:
Art. 2769. Contractor's liability for non-compliance with contract
"Art. 2769. If an undertaker fails to do the work he has contracted to do, or if he does not execute it in the manner and at the time he has agreed to do it, he shall be liable in damages for the losses that may ensue from his non-compliance with his contract."
[2] The parking lot slab was poured in direct contact with the vertical pipe. A "sleeve" encasing the pipe would have prevented the slab from coming into contact with the vertical pipe. In such instance, a sinking slab would not have subjected the pipe (inside the sleeve) to the downward pull.
[3] LSA-R.S. 9:2771 reads as follows:

§ 2771. Non-liability of contractor for destruction or deterioration of work
"No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or it constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evident prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor."
[4] LSA-C.C. art. 2217 reads as follows:

Art. 2217. Confusion, definition
"Art. 2217. When the qualities of debtor and creditor are united in the same person, there arises a confusion of right, which extinguishes the obligation."