**VOLKSWAGEN OF AMERICA, INC., et al.**

v.

**Mr. Willard E. ROBERTSON et al.**

**VOLKSWAGEN OF AMERICA, INC., et al.**

v.

**The UNITED STATES of America.**

**Civ. A. Nos. 75–2708 and 76–275.**

United States District Court,
E. D. Louisiana.

May 31, 1977.

Roger M. Denton, Metairie, La., for plaintiffs.

Arthur S. Mann, III, New Orleans, La., for Mr. Willard E. Robertson, Compact Carriers Division of/and Willard E. Robertson Corp., International Auto Sales and Service, Inc., Mr. Joseph R. Boyd, and Mr. Jack H. Kendricks.

H. F. Foster, III, New Orleans, La., for American Ins. Co.

ALVIN B. RUBIN, District Judge:

Volkswagen of America, Inc. ("VWOA") leased property known as the Higgins Terminal Property from Willard E. Robertson for the storage of automobiles in 1974. Thereafter, on September 7, 1974, Hurricane Carmen struck the New Orleans area and the automobiles were damaged by the rise of water on the property. The inundation was caused by a combination of factors: heavy rains fell, and the gravity drainage system that usually served the property was closed to protect the area from rising waters in an adjacent canal. A relatively small amount of water, together with some bacterial matter that may have caused contamination of the vehicles, may have been deposited by operation of the National Aeronautics and Space Administration facility. VWOA moves for summary judgment against its lessor on the ground that he has breached his obligations under Louisiana law and supports its motion by affidavits and depositions that appear to establish the facts set forth below. Those material facts concerning which there is a genuine dispute have been assumed to be adverse to VWOA's position.

### I

The Higgins Terminal Property, which is located on the west bank of the Michoud Canal, had previously been flooded in 1971 as a result of the heavy rain that accompanied Hurricane Edith. At that time the drainage of the property was reviewed in correspondence between Mr. Robertson and John McNamara, Chief Engineer of the Board of Levee Commissioners of New Orleans Levee District. Mr. Robertson complained: "All of the drainage culvert has been removed, and the property is now flooding because of the removal of the culvert."

Mr. McNamara responded that Mr. Robertson's representatives had, in 1969, informed him that Robertson "was planning to install a pumping station on [his] property to handle the run off water from rains. . . . Based on this assumption the contract for the new levee and floodwall called for the removal of the culverts." He reminded Mr. Robertson that, in 1970, plans for the work had been furnished Mr. Robertson showing the removal of the culverts and stated:

Since we did not receive any objections from you [sic] we assumed that the proposed work met with your approval and the drainage would be handled by your pumping station.

However, since we are now advised that your pumping station is part of a long range project we will make a study to determine the best method of draining the area. I would like to point out at this time that gravity flow thru culverts with flap gates only provides (sic) drainage when the tide in Michoud Canal is lower than the level of the water in the area being drained.

If during a hurricane we experience a high tide and a heavy rainfall, the area behind the levee will be subject to flooding from rain water if gravity flow culverts are utilized for draining the area.

Thereafter, drainage culverts were installed, but no pumping station was provided. There is no evidentiary material in the record to suggest that Mr. Robertson did anything further about the drainage problem. When he leased property to VWOA, he knew it would be used for the open area storage of vehicles during all seasons. He did not mention any potential drainage problem.

On the morning of September 7, 1974, the Levee Board shut off the gates to the gravity drainage system that served the Higgins Terminal property. This prevented water from running off the property into the Michoud Canal. Mr. Robertson was notified promptly that the gates were closed, but he neither notified VWOA nor made any effort to remove the stored vehicles from the property. Thereafter the property was, in fact, flooded, causing damage to 368 vehicles.

The sole factual disputes are raised by an affidavit by Mr. Robertson. This states, insofar as is here pertinent, only:

At no time what so ever during my tenure as owner of the property known as the Higgins Terminal did any flooding condition exist at any time that drainage culverts were installed. In truth and in fact in September of 1971, there were no drainage culverts installed on my property. This was due to construction of a new levee by the Board of Levee Commissioners and the Corps of Engineers. In September of 1971, flooding did exist on the property of a very minor nature. Once drainage culverts were installed, no further flooding occurred and to my knowledge, there has never been any danger of flooding on my property. From my own recollection, there was, during and subsequent to Hurricane Betsy, more than three feet of water on certain piece of property owned by myself located at 4200 Michoud Boulevard. This parcel of ground is located a very short distance from the property known as the Higgins Terminal Property. At the time of Hurricane Betsy and subsequent thereto, there was no flooding on my property which is known as the Higgins Terminal Property and the drainage culverts operated effectively at that time. Neither myself nor any of my employees

had any control over the condition of the drainage culverts on the Higgins Termi-nal Property on the weekend of September 6–8, 1974.

The issue raised by this motion is whether, assuming all of the facts recited in Mr. Robertson's opposing affidavit to be true, and assuming all of the inferences favorable to him that could be drawn therefrom, Mr. Robertson is liable to VWOA as a matter of law.

## II

The Louisiana Civil Code imposes various obligations on the lessor of immovable property. These include the following:

> The lessor guarantees the lessee against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made, and even if they have arisen since, provided they do not arise from the fault of the lessee; and if any loss should result to the lessee from the vices and defects, the lessor shall be bound to indemnify him for the same.

La.–C.C. Art. 2695.

In addition, a Louisiana statute provides:

> The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time.

LSA–R.S. 9:3221.

The Louisiana Civil Code does not define the terms "vices and defects." But these words evidently refer to some shortcoming in the property that makes it less suitable for use than normal property. The lessor's "guarantee" is a warranty, and it exists without regard to knowledge or negligence on the part of the lessor. *Brunies v. Police Jury of Parish of Jefferson,* 1959, 237 La. 227, 110 So.2d 732; *Bennett v. Southern Scrap Material Co.,* 1908, 121 La. 204, 46 So. 211; *Pollard v. Roberts,* App. 1975, 306 So.2d 801; *Turner v. Aetna Cas. & Sur. Co.,* App. 1965, 175 So.2d 304. The implied warranty extends beyond flaws in the thing leased, and embraces its suitability for the intended use: "[T]here is written by law into every contract of lease a warranty that the leased property contains no defects and that the lessee . . . may subject any part thereof to any of the uses for which the property is intended." *Mosher v. Burglass,* Orl.App. 1936, 170 So. 416; *Equilease Corp. v. Hill,* App. 1974, 290 So.2d 423.

The Louisiana jurisprudence was summed up in *Pollard v. Roberts,* App. 1975, 306 So.2d 801, 804:

> Under the Code articles an owner-lessor is strictly liable for loss suffered by a tenant which is caused by a vice or defect of the premises. *King v. Allstate Insurance Company,* 224 So.2d 42 (La.App., 1st Cir. 1969); *Anslem v. Travelers Insurance Company,* 192 So.2d 599 (La.App., 3d Cir. 1966); *Morgan v. American Indemnity Company,* 180 So.2d 429 (La.App., 1st Cir. 1965); *Joyner v. Aetna Casualty & Surety Company,* 240 So.2d 545 (La.App., 2d Cir. 1970), amended 259 La. 660, 251 So.2d 166 (1971). Moreover, a lessor's obligations extend beyond the building or space actually occupied by the tenant and encompass all features of the premises available to the lessee. *Bates v. Blitz,* 205 La. 536, 17 So.2d 816 (1944); *Joyner v. Aetna Casualty & Surety Company,* supra; *Sabin v. C & L Development Corporation,* 141 So.2d 482 (La.App., 1st Cir. 1962); *Estes v. Aetna Casualty & Surety Company,* 157 So. 395 (La.Orl.App. 1934).

In that case, the lessor was removing a rotten tree. Without negligence in its removal, it fell on a trailer located in leased space. The court found that the fallen tree constituted "a vice or defect against which the defendant guaranteed the plaintiffs. . . ." 306 So.2d at 804. It went on to add that the lessor had also failed in his obligation to maintain the premises in a serviceable condition, an obligation clearly

not due to VWOA by Mr. Robertson. But, even if they are dicta, the quoted remarks show that the court also believed the rotten tree to be a defect as the term is used in La.–C.C. Art. 2695. See also *Carlysle v. Aetna Insurance Company,* App. 1971, 248 So.2d 64, dealing with residential property in which an explosion occurred as a result of a gas line being left uncapped.

The possibility that this property might be inundated by rain water was a defect, that is a shortcoming not to be expected in normal property. It was not apparent to the lessee. Moreover, it made the property potentially unsuitable for its intended use, the storage of new cars. Of course, hurricanes would not occur daily, or even annually, and the gravity drainage might not be closed with each hurricane. But Mr. Robertson knew or should have known, because he had been warned by Mr. McNamara, that it was possible that, during some hurricanes, the gravity drainage system might be closed, and the property might then be flooded. When the combination of these events occurred, the defect would manifest itself. The rotten tree in *Pollard* did not fall every day; it fell but once. Its potentiality for falling was the defect. Here, the potentiality for flooding was the defect.

The letter from Mr. McNamara did not refer to the possibility of closing the culverts. But Mr. Robertson has not asserted ignorance of this possibility. The uncontroverted evidence in the record shows that water in the Michoud Canal rose sufficiently to make it necessary that the gravity drainage system be closed to prevent water from the canal from backing up through the system.

■ While R.S. 9:3221 permits the lessor by appropriate provision in the law to relieve himself of liability for unknown defects, he cannot do so with respect to defects about which he knew or should have known. See *Gilliam v. Lumberman Mutual Cas. Co.,* 1961, 240 La. 697, 124 So.2d 913 at 916; see also *Meyers v. Drewes,* App. 1967, 196 So.2d 607. This would apply a fortiori if he knew of a defect and failed to disclose it.

■ The lease requires the tenant to: . . . maintain, protect and preserve the premises in good, clean, well painted order and condition and make all repairs to the premises, as and when needed, including for example, all structural repairs.

But this neither states nor implies an obligation on the part of the tenant to make provisions for drainage facilities to serve the surface of the property, particularly in the absence of either notice of a risk of flooding or express provision that the tenant will take such steps. Such measures are major. They go beyond even structural repairs in a building. The obligation to take them cannot be implied from a duty to maintain the property.

■ The property had a defect, its potentiality for flooding under certain circumstances. The lessor knew of this and knew also that, if it occurred, it would damage the lessee's property. He neither warned of the peril nor took any steps to avert it. The lessee had no obligation to take measures to avoid the risk; therefore, the liability of the lessor is established, and summary judgment will be entered in favor of VWOA and against Mr. Robertson declaring that Mr. Robertson is liable for the damages suffered by VWOA and its subrogee as a consequence of the flooding of the property.