380 So.2d 182 (1980)
JOHN DEERE INDUSTRIAL EQUIPMENT COMPANY, Plaintiff-Defendant in Reconvention-Appellant,
v.
WILLETT TIMBER COMPANY, INC., Defendant-Plaintiff in Reconvention-Appellee.
No. 7200.
Court of Appeal of Louisiana, Third Circuit.
January 30, 1980.
Writ Refused March 21, 1980.
*183 Ledbetter, Percy & Stubbs, J. Michael Percy, Alexandria, for plaintiff-appellant-appellee.
Gold, Little, Simon, Weems & Bruser, Donald R. Sharp, Alexandria, for defendant-appellee-appellant.
Gist, Methvin, Hughes & Munsterman, DeWitt T. Methvin, Jr., Alexandria, for defendant-appellee.
*184 Provosty, Sadler & deLaunay, Michael T. Pulaski, Alexandria, for defendant-third-party plaintiff-appellee.
Before CUTRER, STOKER and WARE, JJ.
WARE, Judge.
This action was brought by John Deere Industrial Equipment Company (John Deere) to enforce an alleged lease of industrial equipment. On January 31, 1975, Willett Timber Company, Inc. (Willett) entered into an agreement styled an "Industrial Equipment Lease" with Norwel Equipment Company of Alexandria, Louisiana (Norwel), a John Deere dealership. Norwel's rights under the agreement were assigned to John Deere on the same date.
Pursuant to that agreement, Willett acquired a large machine equipped for use in the pulpwood industry. The machine was composed of two major components. The larger of the two is manufactured by John Deere and is known as a John Deere Model 544 B Wheel Loader. The other component, which was attached to the John Deere Wheel Loader by Norwel, is manufactured by Rome Industries, Inc. (Rome) and is known as a Rome Model SHN Shear with Feller-Buncher.
The machine was delivered to Willett on January 31, 1975. Shortly after Willett began using the machine, problems were encountered with its hydraulic system. In May of 1976, after Norwel had made numerous unsuccessful attempts to remedy the malfunctioning, Willett returned the machine to Norwel and stopped making the payments required by the agreement.
John Deere brought the present action to compel Willett to resume making the payments and obtained a writ of sequestration, pursuant to which the machine was seized. Willett filed a motion to recall and set aside the writ. After a contradictory hearing, the trial court held that the agreement was actually a sale, rather than a lease, and set aside the writ. The agreement has been treated as a sale in all subsequent proceedings.
Willett answered John Deere's petition and filed a reconventional demand, alleging that the machine contained redhibitory vices. It joined Norwel as a co-defendant, praying for judgment in solido against them. In addition to the rescission of the sale, Willett sought the return of the payments made on the purchase price, the cost of repairs, lost profits and attorney's fees.
Norwel answered Willett's reconventional demand and also reconvened, seeking the unpaid balance due for parts and labor furnished for the repair of the machine. It also filed a third party demand against John Deere and Rome, seeking the rescission of its purchases of the John Deere Wheel Loader and the Rome Shear with Feller-Buncher, indemnification for any judgment rendered in favor of Willett and against Norwel, and attorney's fees. In addition, Norwel sought judgment against John Deere and Rome for the amount of its reconventional demand against Willett in the event that that demand was dismissed, based on a finding that the machine contained redhibitory vices.
John Deere answered Willett's reconventional demand and filed a third party demand against Rome, praying for indemnification against any judgment rendered against it and in favor of Willett or Norwel. John Deere also amended its petition in the principal action, seeking a credit for the value of Willett's use of the machine in the event that judgment was rendered in favor of Willett and against it.
After a trial on the merits, the district court found that the machine contained a redhibitory defect. Judgment was rendered (1) In favor of Willett and against John Deere and Norwel in solido, rescinding the sale and awarding Willett $30,607.09, the amount of the payments made on the purchase price, subject to a credit of $30,000.00 for Willett's use of the machine; (2) In favor of Willett and against John Deere in the amount of $48,000.00 for lost income and $7,500.00 for attorney's fees; (3) In favor of Norwel and against John Deere (on Norwel's third party demand) for all sums recoverable against Norwel with respect to *185 its solidary obligation with John Deere to Willett, plus $3,570, the amount owing for repairs to the machine, and $2,500 for attorney's fees; and (4) In favor of Rome and against Willett, Norwel, and John Deere, dismissing all demands against Rome.
John Deere perfected a suspensive appeal from that judgment. Willett brought a devolutive appeal against all adverse parties and answered John Deere's appeal, asking that the judgment be modified to grant judgment in solido against John Deere, Rome and Norwel. In addition, Willett asks that the judgment be amended to delete the credit for its use of the machine and to include an additional $2,500.00 for the services of its attorney on appeal. Norwel answered the appeals taken by John Deere and Willett, asking that the judgment be amended to include an additional $4,000.00 for services rendered by its attorney on appeal.
The principal issue on appeal is whether the machine contained redhibitory vices or defects. All but one of John Deere's specifications of error pertain to the trial court's finding that it did contain such a defect. John Deere contends that that finding is manifestly erroneous, and Norwel agrees.
As we noted earlier, the machine purchased by Willett was composed of two major components that were assembled by Norwel. One was a John Deere Model 544 B Wheel Loader, and the other was a Rome Model SHN Shear with Feller-Buncher. The John Deere Wheel Loader is a large, self-propelled machine. Its engine supplies power to its wheels through a transmission and also drives a hydraulic pump, from which the machine derives its ability to perform work.
The pump draws hydraulic fluid from a reservoir and expels it under pressure through hoses or lines, which carry the pressurized fluid into a cylinder containing a piston. The force of the fluid against the piston causes it to move within the cylinder. Valves are placed in the lines diverting the flow of fluid to and from the cylinder and within the cylinder itself. This produces a back and forth movement of the piston, which can be controlled by the operator of the machine and used to do work.
The John Deere Wheel Loader is most commonly used by attaching a large bucket or scoop to its front, which is used to move loose materials, such as dirt, sand or gravel. Movement of the bucket is controlled by the hydraulic system, allowing the operator to lift the material and dump it. Laymen generally refer to such machines as "front end loaders".
In this case, a Rome Model SHN Shear with Feller-Buncher was attached to the front of the John Deere Wheel Loader, rather than the usual bucket. Although the Rome attachment is not designed or manufactured by John Deere, John Deere approves its use with its Wheel Loader. John Deere dealers, such as Norwel, purchase the attachment from Rome, connect it to the Wheel Loader, and market the completed unit as one machine. The experts who testified agreed that the marriage of the Wheel Loader's hydraulic pump to the hydraulic components of the Rome assembly produced a single hydraulic system, rather than two separate ones.
As its name suggests, the Rome attachment is also comprised of two major parts. The shear, which consists of hydraulically powered cutting blades, is designed to cut through small trees at ground level. The feller-buncher, which is composed of two large hydraulically operated clamps, then gathers the severed trees and holds them. After a sufficient number are cut, they are released and deposited on the ground in a pile. The assembly is designed to cut and gather the kind of small trees that are converted to pulpwood for use in the manufacturing of paper.
Willett purchased the machine for that purpose. Shortly after Willett began using the machine, it became evident that its hydraulic system was malfunctioning. It repeatedly overheated and had to be shut down and allowed to cool, suspending Willett's operations for valuable periods of time. Norwel made numerous service calls and repairs, but the problems with the machine's hydraulic system continued. When *186 the machine had been operated less than 300 hours, the hydraulic pump had to be completely replaced. Engineers who testified at the trial agreed that the average life of that kind of pump is between 1,500 and 4,000 operating hours and that the repair frequency on the machine was far above normal.
Norwel's mechanics were never able to determine the cause of the repeated failures of the hydraulic system. Even when Willett returned the machine in May of 1976 and discontinued its business operations, they could only suggest a complete testing of the component parts. Their repeated unsuccessful efforts to repair the machine had not given them a clue as to the source of the problem.
At the trial, several experts testified concerning the possible causes for the hydraulic system's failure. It was established that the successful operation of such a system depends on the quality of the fluid within it. The fluid, which is an oil, not only serves as a means of propelling the piston as described earlier but also serves as a lubricant, which prevents the metal surfaces of the pump from coming into contact with one another. Since the pump turns at very high speeds, friction damage will destroy it within a short period of time if it is not properly lubricated.
Excessive heat and contamination of the oil can greatly impair the oil's ability to adequately lubricate the pump. If dirt or other debris is allowed to enter the system, it has an abrasive effect on the smooth metal surfaces of the pump, causing damage. Particulate contamination can also arise from within the system itself, if the viscosity of the oil is reduced by excessive heat or its mixture with water, allowing the metal surfaces of the pump to come into closer contact with one another. Particles of metal are broken off as a result of the closer contact and are carried through the system by the oil, causing further damage.
Friction damage results in increased heat within the system, regardless of whether the initial damage was caused by excessive heat or contamination of the oil. This heat further degrades the oil, causing more damage. Therefore, when this vicious cycle brings about the failure of a hydraulic system, the hydraulic oil will always be found to be in an extremely damaged and contaminated condition. Thus, it can be very difficult to determine the initial cause of the failure.
Willett argues that the problems with the hydraulic system stemmed from its overheating and that the overheating was the result of a defect in the design or manufacture of the machine. Mr. Donald Foster, a mechanical engineer called by Willett, testified that the hydraulic system had an inadequate cooling capacity, because the size of the reservoir was too small. John Deere refuted that testimony, relying on the testimony of other witnesses to the effect that other identical machines, including one borrowed or rented by Willett, functioned satisfactorily and did not fail as a result of overheating.
Mr. Foster also testified that the overheating could have been the result of internal leakage in the pump. On one of their service calls, Norwel's mechanics found that an o-ring had been cut, apparently when the pump was assembled at the factory. According to Mr. Foster, the damaged o-ring could have caused internal leakage. However, John Deere's experts testified that because of the location of the o-ring, only external leakage would have resulted, which would not have caused overheating.
John Deere contends that the failure of the hydraulic system was brought on by Willett's poor maintenance of the machine. Some of Willett's employees testified that at times a brand of hydraulic oil and filters other than John Deere's were used in the machine. John Deere showed that the other filters that were used were inferior to its filters in that they were not able to remove as many particles from the oil and they would burst at a much lower pressure. It was also shown that the storage of the other brand of oil in large, unsheltered drums could have caused it to become mixed with water which condensed inside the drums. However, according to the undisputed *187 testimony of Willett's employees, for at least the first five or six months of the machine's operation only John Deere oil and filters were used. Norwel's work orders showed that in the first few months its mechanics changed the oil and filters several times. According to Willett's employees, the only time they added oil was when oil was lost because a hose broke or became dislodged. On those occasions, they added John Deere oil, which was stored in five gallon containers in the back of a covered truck.
After considering all of the evidence presented at the trial, the trial judge concluded that Willett had failed to prove that there was a redhibitory defect in the design of the John Deere Wheel Loader or in the design or manufacture of the Rome assembly. He found, however, that Willett had proved that there was a manufacturing defect in the John Deere Wheel Loader.
The principles of law applicable to this kind of case were fully summarized by the Louisiana Supreme Court in the following excerpt from its opinion in Rey v. Cuccia, 298 So.2d 840 (La.1974).
"In Louisiana sales, the seller is bound by an implied warranty that the thing sold is free of hidden defects and is reasonably fit for the product's intended use. Civil Code Articles 2475, 2476, 2520; Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972). The seller, of course, can limit this warranty by declaring to the buyer the hidden defects at the time of the sale, Article 2522, or can otherwise limit his obligations as seller, providing he do so clearly and unambiguously, Article 2474.
"A redhibitory defect entitling the buyer to annul the sale is some defect in the manufacture or design of a thing sold `which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.' Article 2520. Upon proof of such a defect, the buyer is entitled to annul the sale and recover the purchase price, rather than being limited to recovering the cost of curing any such substantial defects. Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112 (La. 1973).
"The buyer must prove that the defect existed before the sale was made to him. Article 2530. However, if he proves that the product purchased is not reasonably fit for its intended use, it is sufficient that he prove that the object is thus defective, without his being required to prove the exact or underlying cause for its malfunction. J. B. Beaird Co. v. Burris Bros., 216 La. 655, 44 So.2d 693 (1949); Crawford v. Abbott Automobile Co., Ltd., 157 La. 59, 101 So. 871 (1924); Stumpf v. Metairie Motor Sales, Inc., 212 So.2d 705 (La.App. 4th Cir. 1968); Fisher v. City Sales and Service, 128 So.2d 790 (La.App. 3d Cir. 1961).
"The buyer may prove the existence of redhibitory defects at the time of the sale not only by direct evidence of eyewitnesses, but also by circumstantial evidence giving rise to the reasonable inference that the defect existed at the time of the sale. Fisher v. City Sales and Service, 128 So.2d 790 (La.App. 3d Cir. 1961); Mattes v. Heintz, 69 So.2d 924 (La.App. Orl.1954); Standard Motor Car Co. v. St. Amant, 18 La.App. 298, 134 So. 279 (1st Cir. 1931). As stated in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151, 155: `... proof by direct or circumstantial evidence is sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows the fact or causation sought to be proved is more probable than not.'
"If the defect appears within three days following the sale, it is presumed to have existed before the sale. Article 2537. However, even where the defect appears more than three days after the sale (as here, when it appeared on the second day of use, but ten days after the sale), if it appears soon after the thing is put into use, a reasonable inference may arise, in the absence of other explanation or intervening cause shown, that the defect existed at the time of the sale. Andries *188 v. Nelson, 46 So.2d 333 (La.App. 1st Cir. 1950); Standard Motor Car Co. v. St. Amant, 18 La.App. 298, 134 So. 279 (1st Cir. 1931). See, for similar principle, when a constructed thing fails shortly after being put into use. Joyner v. Aetna Casualty & Surety Co., 259 La. 660, 251 So.2d 166 (1971)."
After carefully examining the evidence in the record in light of those principles, we cannot say that the trial judge's findings are manifestly erroneous. They will, therefore, not be disturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
John Deere's other specification of error is concerned with the trial court's award of damages to Willett. The trial court found that because of the chronic overheating of the machine, which required that it be shut down and allowed to cool during the workday, Willett was not able to fill all of its orders for wood chips. The failure to fill those orders resulted in a loss of income. John Deere does not dispute Willett's proof as to its loss or the trial judge's finding that it was caused by the malfunctioning of the machine. It simply argues that Willett is not entitled to damages because its business venture was unprofitable at its inception. We disagree. Although it is clear that Willett's endeavor would have been unprofitable even if the machine had functioned perfectly, its poor performance resulted in a loss to Willett. As a manufacturer, John Deere is presumed to know of the defects of the thing which it manufactures, and under LSA-C.C. Art. 2545, it is liable to the buyer for the damages it caused. Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978).
We turn now to Willett's arguments with respect to the credit given to John Deere and Norwel for its use of the machine. The issue raised by those arguments was addressed by the Louisiana Supreme Court in Alexander v. Burroughs Corporation, supra, wherein the court said:
"A credit for a purchaser's use of a product may be proper in certain instances, even in favor of a bad faith seller. In the absence of specific provisions punitive damages are not obtainable in Louisiana; the object of the provisions governing redhibitory vices is to restore the purchaser, as much as possible, to the condition he enjoyed prior to the sale. Compensation for the buyer's use, however, ought not be granted automatically by the courts; even the value of an extensive use may be overriden by great inconveniences incurred because of the defective nature of the thing and constant interruptions in service caused by the seller's attempts to repair."
It is clear from that language that the trial court has discretion to allow a credit for use if such a credit is warranted under the facts of a particular case. After reviewing the facts of this case, we agree with the trial judge that a credit was in order.
Undoubtedly, Willett was inconvenienced by the time lost when the machine was being repaired or allowed to cool. Nevertheless, the machine was not totally useless. In the 15 months that Willett used it, Willett was able to produce approximately 60% of the wood chips that were ordered and realized a gross income of over $237,000. Mr. Glen Manzer, president of Norwel, testified that the rental value of the machine was $4,869.00 per month. The trial judge correctly held that John Deere and Norwel were not entitled to a credit for the full rental value due to the poor performance of the machine. He concluded that $2,000 per month was a reasonable amount and allowed a credit of $30,000 for the 15 months that Willett used the machine.
Willett points out that it was only paying $1,777.38 per month for the machine. However, we do not find it at all unusual for the rental price of such a machine to be considerably higher than the deferred payments provided for in a credit sale. The difference reflects the cost of repairs not covered under the warranty and depreciation. Willett would have had to bear those costs in addition to its monthly payments on the purchase price if the sale had not been rescinded. Under these circumstances, we do not believe that the trial *189 judge abused his discretion in allowing a credit of $30,000.
The only remaining matters to be disposed of are the requests for additional attorney's fees. Willett and Norwel were awarded attorney's fees by the trial court. Those awards are clearly authorized by LSA-C.C. Art. 2545, and we believe that Norwel is entitled to an increase for the additional attorney's fees which it incurred in order to protect its rights on appeal. Conlay v. Houston General Insurance Company, 370 So.2d 196 (La.App. 3rd Cir. 1979). Willett is not only protecting its rights on appeal, however. It sought additional relief, which was denied. In view of that fact, we find that it is not entitled to additional attorney's fees. Conlay v. Houston General Insurance Company, supra.
Accordingly, that portion of the judgment which is rendered in favor of Norwel and against John Deere awarding Norwel $2,500 is amended to increase the award to $3,250. As amended, the judgment is affirmed. All costs of this appeal are assessed against John Deere Industrial Equipment Company.
AMENDED AND AFFIRMED.